**In re AIR CRASH AT DETROIT METRO-POLITAN AIRPORT, DETROIT, MICHIGAN ON AUGUST 16, 1987.**

**NORTHWEST AIRLINES, INC., Plaintiff,**

v.

**MCDONNELL DOUGLAS CORPORATION, and Texas Instruments, Inc./Klixon, Defendants.**

**NORTHWEST AIRLINES, INC., Plaintiff,**

v.

**MCDONNELL DOUGLAS CORPORATION, Texas Instruments, Inc./Klixon, and National Car Rental System, Inc., Defendants.**

**NORTHWEST AIRLINES, INC., Plaintiff,**

v.

**CAE ELECTRONICS, LTD, Defendant.**

MDL No. 742.

Nos. 89–3236, 89–2696 and 90–3482.

United States District Court, E.D. Michigan, S.D.

Jan. 17, 1992.

Carroll E. Dubuc, Michael Selter, Aidan Jones, William Evans, Washington, D.C., for plaintiff.

Douglas E. Winter, Washington, D.C., Donald E. Shely, Detroit, Mich., for defendant McDonnell Douglas.

Thomas Keenan, Farmington Hills, Mich., Kent M. Johnson, Robert White, Dallas, Tex., for defendant Texas Instruments.

Richard Ward, Michelle Thomas, Southfield, Mich., for CAE Electronics.

Fred C. Begy, John Adler, Richard Walker, Chicago, Ill., Carl Greenberg, Short Hills, N.J., for defendant Nat. Car Rental Systems.

## ORDER

JULIAN ABELE COOK, Jr., Chief Judge.

This case involves a tragedy that occurred on August 16, 1987 when Northwest Airlines Flight 255 crashed shortly after takeoff from the Detroit Metropolitan Air-

port and resulted in the death of one hundred fifty-six people and injuries to several other persons.

There are a variety of motions, most of which have been filed by the Third–Party Defendants[1] in this cause, that are currently pending before this court. These motions are based on the jury verdict and ensuing final judgment which addressed and resolved the general loss claims between Northwest Airlines, Inc. (Northwest) and McDonnell Douglas Corporation (MDC).

Northwest has filed cross-motions for summary judgment and a motion to amend its complaints. In addition, Northwest and MDC have filed cross-motions for summary judgment which relate to whether MDC is entitled to contribution, indemnity, and subrogation in the "special defense" cases.[2] All of these pleadings raise complex and vexing issues pertaining to choice of law, collateral estoppel (issue preclusion), res judicata (claim preclusion), the law of the case doctrine, and, finally, contribution, indemnity and equitable subrogation.

For the following reasons, the court will (1) grant MDC's July 16, 1991 motion for summary judgment in the loss of aircraft hull cases, (2) grant the July 16, 1991 motion for summary judgment by Texas Instruments Inc./Klixon (TI), (3) grant in part and deny in part the July 16, 1991 motions of National Car Rental System, Inc. (NCR), (4) grant in part and deny in part Northwest's August 30, 1991 cross-motion for summary judgment against NCR, (5) grant in part and deny in part Northwest's September 11, 1991 motion to amend its claims, (6) grant in part the July 16, 1991 requests of CAE Electronic, Ltd. (CAE), (7) grant MDC's November 8, 1991 motion for summary judgment in the special defense cases, and (8) deny Northwest's November 21, 1991 cross-motion for summary judgment.

## I.

The first case to arise from the tragedy at the Detroit Metropolitan Airport was filed with this court on August 28, 1987 and charged Northwest and MDC, the manufacturer of the aircraft, with being responsible for the deaths of the occupants of the accident aircraft. The chief allegations against Northwest included the negligence of the pilots in failing to (1) set the flaps and slats for takeoff, (2) perform a proper checklist to ensure proper configuration for takeoff, and (3) perform mandatory stall recovery procedures. MDC was alleged to have provided Northwest with a defective warning system within the accident aircraft.[3] Both of the Defendants denied these allegations.[4]

---

1. The pleadings pertain to cross-claims, counterclaims, first-party claims, third-party claims, and even fourth-party claims. For convenience, this court will identify these pleadings generically as the third-party claims because the legal and factual basis for all of the claims, no matter how entitled, are identical. Many, if not all, of these claims have been asserted in each of the over 150 cases that are before this court. Accordingly, this order applies to all of the MDL No. 742 cases in addition to those specified in the caption and elsewhere.

2. Northwest has asserted "special defenses" against three categories of passengers: (1) the limitation of liability that is contained within the Warsaw Convention, 49 U.S.C. note following § 1502, (2) exculpatory language within its travel passes on which off-duty employees were travelling, and (3) the limitation of liability that is contained within workers' compensation statutes. Therefore, this order also applies to: *Blakley v. Northwest Airlines*, 88–1919, 88–4894;

*Cook v. Northwest Airlines*, 89–1310; *Elfering v. Northwest Airlines*, 88–0680; *Grigg v. Northwest Airlines*, 87–4582; *Johnson v. Northwest Airlines*, 88–4893, 88–2040; *Kahle v. Northwest Airlines*, 88–0526; *Morris v. Northwest Airlines*, 737 F.Supp. 422 (E.D.Mich.1989); *Pearson v. Northwest Airlines*, 88–1871; *Rademacher v. Northwest Airlines*, 88–1270; *Ross v. Northwest Airlines*, 88–4895, 88–1914; *Roundy v. Northwest Airlines*, 89–1276; *Royden v. Northwest Airlines*, 89–1960; *Shaffer v. Northwest Airlines*, 88–4651; *Wennen v. Northwest Airlines*, 88–0702.

3. For more details of the allegations against and between Northwest and MDC, see Order, MDL No. 742 (March 19, 1991).

4. Since the filing of the initial lawsuit, there have been over one hundred and fifty cases filed in a federal court as a result of this air disaster. Several cases were filed in state courts and some claims were settled prior to the filing of a complaint.

Shortly thereafter, Northwest filed cross-claims and third-party complaints for contribution and indemnity against MDC, TI,[5] NCR,[6] CAE,[7] and the United States Government.[8] In turn, MDC filed cross-claims and counterclaims for contribution and indemnity against Northwest. In separate but related lawsuits, Northwest filed complaints against MDC and the other Third–Party Defendants, seeking damages from them for, among other things, the loss of the aircraft hull.

On December 9, 1987, the Judicial Panel on Multidistrict Litigation (JPML) ordered the transfer of all Northwest Flight 255 federal cases to this district for consolidated pretrial proceedings. On August 18, 1989, all of the multidistrict litigation cases were transferred to, and consolidated in, this court for trial. Order, *In re Air Crash Disaster at Detroit Metropolitan Airport, Detroit, Michigan on August 16, 1987*, 737 F.Supp. 391 (E.D.Mich.1989).

On April 18, 1988, this court appointed a Plaintiffs' Steering Committee (PSC), consisting of six experienced mass disaster attorneys, to pursue pretrial matters on behalf of all of the multidistrict federal Plaintiffs. *See* Practice and Procedure Order No. 2, MDL No. 742, at 3–4 (E.D.Mich. April 18, 1988); *see also* Order, MDL No. 742, at 10 (E.D.Mich. August 18, 1989) (stating intention of court to appoint PSC to serve as trial counsel for prosecuting joint liability trial on behalf of all Plaintiffs).

The pretrial proceedings were extensive, consuming over two years and resulting in over 200 days of depositions, 1,400 docket entries, and 175 written orders by this court. The first witness at trial was sworn on October 12, 1989. The trial proceedings followed the path of the pretrial proceedings in terms of consumption of time, number of issues, docket entries, exhibits, and court orders.

Against this trial background were continuous settlement negotiations by the parties and, in some instances, a complete resolution of a disputed issue or claim. As an example, Northwest settled a number of individual cases prior to the start of the joint liability trial, some of which involved stipulations not to contest liability in exchange for a compensatory damages-only trial.

After considering various proposals with respect to the procedure for addressing all of the issues in the case, this court determined that it would resolve the litigation through a sequence of trials. First, a joint liability trial involving the claims of all nonsettling Plaintiffs against Northwest and MDC, and of all claims for contribution and indemnity between Northwest and MDC, would be conducted.[9] Second, damage trials would follow in order to determine the amount of the compensation that would be payable to the nonsettling Plaintiffs and to those Plaintiffs who accepted damages-only stipulations. Third, a second liability trial would be held to resolve Northwest's third-party claims.

Jury selection for the joint liability trial began on October 2, 1989. During the voir dire, Northwest advised the court, in camera, that it had reached a settlement with

---

**5.** TI manufactured a circuit breaker that was subsequently incorporated into the warning system on the accident aircraft. Northwest generally alleged that the circuit breaker was defective and a proximate cause of the crash.

**6.** A wing of the accident aircraft struck a NCR light pole during takeoff. Northwest alleged, *inter alia,* that the placement of the light pole violated applicable Federal Aviation Administration regulations (FARs) and proximately caused the crash.

**7.** Northwest alleged in part that CAE manufactured a simulator on which the pilots of Northwest Flight 255 were negligently trained. The

complaint (1) sounds in products liability, breach of a sales contract, breach of implied warranties of merchantability and fitness for a particular purpose, misrepresentation, and contribution, and (2) was filed in the United States District Court for the District of Minnesota in August 1990 and subsequently transferred to this court by the Judicial Panel on Multidistrict Litigation.

**8.** On December 5, 1989, the United States Government was dismissed as a party litigant in this case with the concurrence of Northwest.

**9.** The court has severed Northwest's third-party complaints.

(1) the Plaintiffs whose claims were governed by the Warsaw Convention, workers' compensation statutes, or the provisions of an employee flight pass, and (2) the vast majority of the paying passengers who were injured or deceased as a result of the accident. Subsequent to the consummation of these settlements, this court permitted those Plaintiffs who had declined to settle with Northwest to sever their claims against the air carrier from the liability trial. As a result of these events, the litigative posture of the joint liability trial commenced with (1) the Plaintiffs pursuing their claims against MDC only, (2) Northwest remaining in the case as a Third–Party Plaintiff and pursuing its claims against MDC, and (3) MDC seeking relief against Northwest through an adjudication of its cross-claims and counterclaims.

On February 14, 1990, MDC reached settlements with a wrongful death claimant and the remaining personal injury claimants. On March 28, 1990, this court was advised by MDC of the likelihood of its settlements with most or all of the remaining Plaintiffs.

On April 6, 1990, the last Plaintiff accepted MDC's offer of settlement. On August 16, 1990 and following the final submission of the requisite documentation by the Plaintiffs, this court determined that there were no Plaintiffs remaining in the joint liability trial. On September 4, 1990, this court granted the PSC's motion to be relieved of all further responsibility of attending and participating in the trial.

On May 8, 1991, the jury reached a verdict and found Northwest to be responsible for the accident. See Verdict Form (Attachment A). On May 31, 1991, a final judgment on these claims was entered by the court. See Final Judgment On Claims Between Northwest Airlines and McDonnell Douglas (Attachment B). Subsequently, this court denied Northwest's motion for a judgment notwithstanding the verdict, as well as its alternative motion for a new trial, but granted in part its motion to amend the judgment. See October 1, 1991 Amended Final Judgment (Attachment C).

Northwest filed its notice of appeal from these judgments on October 24, 1991.

## II.

■ The United States Court of Appeals for the Sixth Circuit (Sixth Circuit) follows the minority view that federal standards govern summary judgment motions in diversity cases. *Lewis Refrigeration Co. v. Sawyer Fruit, Vegetable and Cold Storage Co.*, 709 F.2d 427, 430 n. 3 (6th Cir.1983). Under Rule 56(c) of the Federal Rule of Civil Procedure, a summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In 1984, the Sixth Circuit opined that "[a] fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties. [citation omitted]." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)). The court must view the evidence in a light that is most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Bender v. Southland Corp.*, 749 F.2d 1205, 1210–11 (6th Cir.1984).

■ The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 861 (6th Cir.1986). The initial burden on the movant is not as formidable as some decisions have suggested. The moving party need not produce evidence which demonstrates the absence of a genuine issue of material fact. Rather, "the burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court—

that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving party has discharged that burden, the nonmoving party has the obligation to set forth specific facts which will demonstrate the existence of a genuine triable issue. Fed.R.Civ.P. 56(e); *Gregg*, 801 F.2d at 861.

■ To create a genuine issue of material fact, the nonmovant must do more than present some evidence on a disputed issue. The United States Supreme Court, in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. at 2505, 91 L.Ed.2d 202 (1986), stated

> there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Id.* at 249–50, 106 S.Ct. at 2511 (citations omitted); *see Catrett*, 477 U.S. at 322–23, 106 S.Ct. at 2552; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The standard for summary judgment mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a). *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. Consequently, a nonmovant must do more than raise some doubt as to the existence of a fact. The nonmovant must produce evidence that would be sufficient to require the submission of the dispute over the fact to the jury.

## III.

On July 16, 1991, MDC filed a motion for summary judgment, Fed.R.Civ.P. 56, in the aircraft hull loss cases, Nos. 89–3236 and 89–2696. These cases are to be distinguished from the so-called general loss cases in which Northwest and MDC brought cross-claims against each other for contribution and indemnity for monies paid to those persons who were injured or killed in the accident.

In the general loss cases, Northwest asserted four causes of action against MDC: (1) indemnity based in negligence, strict liability, and breach of warranty [Count 8], (2) contribution on the basis of negligence, strict liability, and breach of warranty [Count 9], (3) intentional misrepresentation/failure to disclose [Count 10], and (4) negligent misrepresentation/failure to disclose [Count 11].

In the aircraft hull loss cases,[10] Northwest alleged the same causes of action: (1) negligence, strict liability, and breach of warranty [Count VII], (2) indemnity on the basis of negligence [Count VIII], (3) contribution based in negligence [Count IX], (4) intentional misrepresentation/failure to disclose [Count X], and (5) negligent misrepresentation/failure to disclose [Count XI].

The general loss and hull loss cases raise similar factual allegations pertaining to (a) the contract between Northwest and MDC for the purchase of the accident aircraft, (b) the Federal Aviation Administration (FAA) type certification of the aircraft, (c) the TI 7274–55 circuit breakers, (d) the takeoff warning system, (e) the Central Aural Warning System (CAWS) fail light, (f) the flight director, (g) the auto-slat system, (h) the stick pusher, (i) the NCR light pole, and (j) the MD–82 simulators. *Compare* Attachments A and B of MDC Motion for Summary Judgment (July 16, 1991) *with* Attachment C of same motion.

**10.** Northwest brought two aircraft hull loss cases. One case was filed in the United States District Court for the District of Columbia, which included claims against TI and the United States Government. The other case was initiated in the Wayne County (Michigan) Circuit Court, in which TI and NCR were named as Defendants. The former case was transferred to this court pursuant to an order of the JPML. The latter case was removed to this district over the objections of Northwest. In these cases Northwest seeks to recover damages resulting from the crash, including (a) the replacement cost of the aircraft and cargo, (b) consequential damages, including wreckage removal, storage and disposal costs, loss of revenue and income, and loss of good will of the flying public, and (c) the costs of rescue operations, fire control, accident investigation, security services, cleanup and/or repair and restoration of the accident site.

In its motion, MDC contends that, since the jury verdict and amended final judgment held Northwest 100% at fault for the accident, the hull loss complaints should be dismissed with prejudice as to it on the basis of (1) claim preclusion (res judicata), (2) issue preclusion (collateral estoppel), and (3) the law of the case doctrine. Northwest disagrees.

### A.

■ A threshold question is whether federal or state law determines the preclusive effect of a federal diversity judgment in a subsequent diversity case. Moreover, since the District of Columbia suit, No. 89–3236, was transferred to this district pursuant to 28 U.S.C. § 1407 by the JPML and later consolidated for trial according to 28 U.S.C. § 1404(a), *see* 737 F.Supp. at 394, a separate question is whether the applicable federal law to apply in this case should be based on the decisions from the United States Court of Appeals for the D.C. Circuit or the Sixth Circuit.[11] This court is impressed by, and agrees with, the extensive analysis of the latter issue in *In re Korean Air Lines Disaster of September 1, 1983*, 829 F.2d 1171 (D.C.Cir.1987), *aff'd on other grounds*, 490 U.S. 122, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989) (*KAL*). In *KAL*, the district court was also confronted with multidistrict litigation involving an airline disaster. The lawsuits in that action had been initially filed in (1) the Southern and Eastern Districts of New York, (2) the Eastern District of Michigan, (3) the District of Massachusetts, and (4) the District of Columbia. All of the actions were transferred to the District of Columbia pursuant to 28 U.S.C. § 1407 for the purpose of consolidated pretrial proceedings.

An issue arose as to whether the damage limitation of the Warsaw Convention applied because of the claimed inadequate type size of the liability limitation notice that was printed on the passenger tickets. A resolution of the matter became complicated because the case law from the Second Circuit Court of Appeals (Second Circuit), from which several actions had been transferred, held that the inadequate type size obviated the damage limitation. The District of Columbia (D.C.Circuit) and First Circuit Courts of Appeal, as well as the Sixth Circuit, had not yet addressed the issue. The district court independently applied its own analysis to the issue, rejected the Second Circuit holding, and determined that the inadequate type size of the liability limitation notice did not obviate the damage limitation. The district thereafter applied this decision to all cases notwithstanding the law of the fora in which they had been originally filed.

On appeal, the District of Columbia Circuit upheld the decision of the lower court to engage in an independent and reasoned analysis rather than to apply possibly divergent federal law on the basis of the districts in which the lawsuits were filed. In so doing, it regarded the rule of *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964),[12] as inapplicable, since it only pertained to state law issues. In *KAL*, the law to be applied was federal (the Warsaw Convention), as to which there is or should be but one uniform law throughout the federal system, with the Supreme Court as the final expositor. Even though federal courts may have dif-

11. This issue arises in other motions that are pending before the court. For example, Northwest, in its response to CAE'S current motion, relies upon the law within the Eighth Circuit to argue that the preclusive effect of a diversity judgment is determined by reference to state law. CAE, on the other hand, rests its position, in part, upon contrary Sixth Circuit law. Thus, the issue is not mere sophistry.

12. *Van Dusen* held that when a defendant in a diversity action moves for a venue transfer under 28 U.S.C. § 1404(a), the law of the transferor forum applies post-transfer as to matters of state law because the venue change accomplishes "but a change of courtrooms." 376 U.S. at 639, 84 S.Ct. at 821. In *Ferens v. John Deere Co.*, 494 U.S. 516, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990), the Supreme Court held that even when a plaintiff seeks a section 1404(a) transfer to another forum, the law of the transferor forum applies post-transfer. However, neither *Van Dusen* nor *Ferens* addressed whether the federal law of the transferor forum applies to any federal issues that may arise in the litigation.

ferent interpretations of federal law, "each has an obligation to engage independently in reasoned analysis. Binding precedent for all is set only by the Supreme Court, and for the district courts within a circuit, only by the court of appeals for that circuit." 829 F.2d at 1176. In more detail, the court explained:

> Application of *Van Dusen* in the matter before us, we emphasize, would not produce uniformity. There would be one interpretation of federal law for the cases initially filed in districts within the Second Circuit, and an opposing interpretation for cases filed elsewhere. Applying diverse interpretations of the governing federal law to plaintiffs, depending solely upon where they initially filed suit, would surely reduce the efficiencies achievable through consolidated preparatory proceedings. Indeed, because there is ultimately a single proper interpretation of federal law, the attempt to ascertain and apply diverse circuit interpretation simultaneously is inherently self contradictory. Our system contemplates differences between states' laws; thus a Multidistrict Judge asked to apply diverse state positions on a point of law would face a coherent, if sometimes difficult, task. But it is logically inconsistent to require one judge to apply simultaneously different and conflicting interpretations of what is supposed to be a unitary federal law. [footnote omitted].

*Id.* at 1175–76.

In the multidistrict litigation before this court, the lawsuit that had been initiated in the District of Columbia was transferred pursuant to section 1407 as in *KAL*, and subsequently consolidated for all purposes under section 1404(a) as in *Van Dusen*. This court believes that the binding precedent, if any, from the Sixth Circuit should be examined and, if none exists, an evaluation of other circuit law should be undertaken in order to make a reasoned decision. This multidistrict litigation, which is already overextended, deserves to have but one interpretation of federal law. *See also*

*Isaac v. Life Investors Insurance Company of America,* 749 F.Supp. 855, 863 (E.D.Tenn.1990); *In re Air Crash Disaster at Stapleton International,* 720 F.Supp. 1493, 1496 (D.Colo.1989); Marcus, *Conflicts Among Circuits and Transfers Within the Federal Judicial System,* 93 Yale L.J. 677 (1984); Steinman, *Law of the Case: A Judicial Puzzle in Consolidated and Transfer Cases and in Multidistrict Litigation,* 135 U.Pa.L.Rev. 595 (1987).

■ The next threshold issue is whether federal or state law must be applied to determine the collateral estoppel effect of a federal court judgment that is based on diversity jurisdiction in a subsequent federal diversity suit. MDC contends that federal law controls. Northwest submits that the state law of Michigan [13] governs. For the reasons that this court has expressed in an earlier opinion, all of which are incorporated into this order, federal law will control. *Ratliff v. Northwest Airlines, Inc.,* 776 F.Supp. 316 (E.D.Mich.1991).

### B.

■ Under federal law, collateral estoppel or issue preclusion may be applied only if four criteria have been established:

(1) the issue in the instant case is the same as in the prior litigation;

(2) the issue was litigated in the prior adjudication;

(3) the determination of the issue in the prior adjudication was a critical and necessary part of the judgment in that action; and

(4) the party against whom the earlier decision is asserted had a full and fair opportunity to litigate the issue in the prior litigation.

*NLRB v. Master Slack and/or Master Trousers,* 773 F.2d 77, 81 (6th Cir.1985); *accord Central Transport Inc. v. Four Phase Systems, Inc.,* 936 F.2d 256 (6th Cir.1991).

---

**13.** Northwest, while agreeing that federal law governs the claim preclusive effect of a final federal court diversity judgment, contends that state law controls its issue preclusive effect. MDC maintains that federal common law controls all claim and issue preclusion matters.

Northwest contends that issue preclusion should not be applied because (1) it would not save time and would distort the second trial, (2) the utilization of this doctrine would be unfair to its position in this case, (3) it should not be applied in mass tort litigation, and (4) MDC's and Northwest's claims were not essential to the amended final judgment. This court disagrees.

First, the time saving argument is misplaced and, simply put, wrong. Issue preclusion is a matter of equity. *Nations v. Sun Oil Co. (Delaware),* 705 F.2d 742, 744 (5th Cir.1983). If the criteria for issue preclusion are met, MDC, of all litigants, should be entitled to its embrace following such costly and lengthy litigation. The contention that a jury could not determine comparative fault without MDC in Northwest's other hull suits is meritless, notwithstanding the dissent to its mandamus petition upon which Northwest relies. *In re Aircrash at Detroit Metropolitan Airport on August 16, 1987,* No. 89–1457 (6th Cir. June 13, 1989) (unpublished) (Wellford, J., dissenting). Northwest also does not refer to any compelling authority that would support its proposition that "[t]he policies denying nonmutual preclusion where it would not save time and could distort the decision are applicable to MDC's attempted use of mutual preclusion." Northwest Response Brief, at 12. Moreover, to deny MDC its use of a legitimate claim to issue preclusion would be unfair in terms of expense, time, and certainty. The claims between Northwest and MDC have been fully vented for over four years.

Second, the unfairness argument has been previously raised and rejected by this court:

Northwest has raised these same issues as grounds for a new trial, all of which the court has rejected. Order, MDL No. 742, October 1, 1991. Although the standard that would form the basis for overturning the judgment and the standard for finding error that precludes the application of ... collateral estoppel are not the same, *Jack Faucett Assocs., Inc. v. American Telephone and Telegraph Co.,* 744 F.2d 118, 128–29 (D.C.Cir.1984), *cert. denied,* 469 U.S. 1196, 105 S.Ct. 980, 83 L.Ed.2d 982 (1985), Northwest's assertions about the alleged procedural unfairness attendant to the first trial are meritless. In every case, discovery could be pursued indefinitely and more witnesses could always be called. However, like life, litigation must end at some point. In this case, Northwest engaged in substantial discovery and had the opportunity for more diligent discovery. The trial of the claims between Northwest and MDC covered eighteen months, litigation that approached incredulous proportions in terms of time, contentiousness, paperwork, witness examinations, and rhetoric. Juxtaposed against the monolithic pretrial and trial proceedings, Northwest's claims of lack of discovery and inability to call witnesses reverberate much sound and fury but little substance. Since the court has rejected Northwest's assertions in their entirety, not just as harmless error, there is no unfairness to Northwest in permitting ... estoppel in *Ratliff.*

*Ratliff,* 776 F.Supp. at 325–26.

Third, this court has rejected Northwest's contention that collateral estoppel should not be applied in mass disaster litigation:

However, Northwest contends that *Parklane Hosiery [Co., Inc. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) ], while sanctioning the application of offensive collateral estoppel by a nonparty to a prior judgment, curtailed its use. Insofar as it is relevant to this litigation, Northwest refers to the alleged command from the Supreme Court that offensive collateral estoppel could not be used in mass tort litigation. *Id.* at 330 & n. 14 [99 S.Ct. at 651 & n. 14]; *see In re Bendectin Products Liability Litigation,* 749 F.2d 300, 305 & n. 11 (6th Cir.1984) (noting Supreme Court's explicit instruction that offensive collateral estoppel is not to be applied in mass tort litigation); *accord Lynch v. Merrell National Laboratories,* 830 F.2d 1190, 1192 (1st Cir.1987).

. . . .

In *Parklane Hosiery*, the Supreme Court did permit the use of offensive collateral estoppel. Noting the arguments that had been advanced for rejecting its use, the Court identified several factors to consider in applying this doctrine but established no rigid rules:

We have concluded that the preferable approach for dealing with these problems in the federal courts is not to preclude the use of offensive collateral estoppel, but to grant trial courts broad discretion to determine when it should be applied. [footnote omitted]. The general rule should be that in cases where a plaintiff could easily have joined in the earlier action or where ... the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel.

*Id.* at 331 [99 S.Ct. at 651–52]. Given this broad grant of discretion, which is to be exercised in light of the mentioned factors as well as others, this court is puzzled by the broad comment of the Sixth Circuit in *Bendectin* that, "[i]n *Parklane Hosiery* the Supreme Court explicitly stated that offensive collateral estoppel could not be used in mass tort litigation." 749 F.2d at 305 n. 11. A close reading of *Parklane Hosiery* reveals that the Court (1) authorized the use of offensive collateral estoppel, and (2) only mentioned, but did not broadly accept, the arguments that have been advanced against the wholesale application of offensive collateral estoppel.

Thus, one argument against offensive estoppel "is that it may be unfair to a defendant." *Parklane Hosiery*, 439 U.S. at 330 [99 S.Ct. at 651] (emphasis added). One situation in which its application might be unfair is when

a railroad collision injures 50 passengers all of whom bring separate actions against the railroad. After the railroad wins the first 25 suits, a plaintiff wins in suit 26. Professor Currie argues that offensive use of collateral estoppel should not be applied so as to allow plaintiffs 27 through 50 automatically to recover.

*Id.* at n. 14 [99 S.Ct. at 651 n. 14] (emphasis added). "[A]nother situation where it might be unfair to apply offensive estoppel is where the second action affords that defendant procedural opportunities unavailable in the first action that could readily cause a different result." *Id.* at 331 [99 S.Ct. at 651] (emphasis added).

Accordingly, this court cannot blithely accept the proposition that offensive collateral estoppel is inappropriate because *Ratliff, Corona,* and the Bystander cases are part of "mass tort litigation." This court interprets *Bendectin* as precluding the utilization of offensive estoppel in a mass tort litigation situation that would be similar to that in Professor Currie's hypothetical and in other situations in which its application would be unfair to the defendant. The contours of when offensive collateral estoppel would be unfair—even in mass tort litigation—should be developed on a case-by-case basis. Invoking the term "mass tort litigation" is meaningless without contextual analysis. The teaching of *Parklane Hosiery* is that the issue is delicate and must be handled in this manner.

*Id.* at 324–25. More importantly, MDC is principally relying upon the defensive use of collateral estoppel, as to which the *Parklane Hosiery* and *Bendectin* language does not apply. In addition, Northwest and MDC were the only parties to the lengthy joint liability trial, making moot any issues about mutuality.

Fourth, the essential elements of Northwest's claims in the hull suits are identical to the elements in the general loss claims. The jury evaluated the factual and legal bases for these claims adversely to Northwest. Thus, the jury necessarily decided that (1) MDC did not negligently design or manufacture the aircraft (Special Verdict Answers 21 and 23), (2) MDC did not defectively design or manufacture the aircraft (Special Verdict Answers 15 and 17), (3) MDC did not fail to warn Northwest about any dangerous propensities of the aircraft that would make it defective (Special Verdict Answers 19 and 25), (4) MDC was not

negligent for failing to comply with any governmental regulations (Special Verdict Answer 27), (5) MDC did not make any intentional or negligent misrepresentations in its All Operator Letters concerning the quality of TI circuit breakers (Special Verdict Answers 29 and 31), and (6) MDC did not make an intentional misrepresentation to the FAA about the operation of the CAWS Fail Light (Special Verdict Answer 33). *See also* October 1, 1991 Amended Final Judgment. All or portions of these issues are essential to Northwest's claims in the hull suit. Since they were decided adversely to Northwest by the jury following a lengthy and contentious trial, they cannot and should not be relitigated in the hull suit pursuant to the doctrine of issue preclusion, the application of which is unobstructed. *See Womack v. Gettelfinger,* 808 F.2d 446, 455 (6th Cir.1986), *cert. denied,* 484 U.S. 820, 108 S.Ct. 78, 98 L.Ed.2d 41 (1987); *Marino v. McDonald,* 611 F.Supp. 848 (E.D.Mich.1985) (action dismissed when collateral estoppel removes essential elements of plaintiff's claim).

Accordingly, for the foregoing reasons, MDC's motion for summary judgment in the hull loss cases is granted in its entirety.[14] MDC shall submit an appropriate form of judgment.

### IV.

On July 16, 1991, TI moved for the entry of a summary judgment, Fed.R.Civ.P. 56(c), on the basis of the jury verdict and the amended final judgment. TI also filed a motion, in which it asked this court to determine the choice of law issue pertaining to the third-party claims that Northwest has lodged against it. Northwest opposes both of the TI motions.

Northwest's claims against TI are based on a TI circuit breaker. One feature of the accident aircraft was its CAWS, one function of which was to provide a supplemental alert to flight crews of improperly positioned flaps during takeoff. A circuit breaker in the "P40" position on the Northwest 255 aircraft was part of the power source to the CAWS. TI designed, manufactured, and sold this circuit breaker to MDC according to the terms of a contract that was governed by the law of Massachusetts.

In its third-party claims against TI, as well as during the trial against MDC, Northwest contended that the P40 circuit breaker was defective and a proximate cause of the crash. It took the position that the circuit breaker was defectively designed and manufactured, which, in turn, allowed particulate contamination to render it, and concomitantly, the CAWS, to become inoperative. This, according to Northwest, prevented the 255 crew from being warned that the flaps/slats had not been set for takeoff.

During the joint liability trial, it was the position of MDC that the circuit breaker was not defective and had not failed because of particulate contamination. Rather, MDC contended, in part, that the flight crew had intentionally disabled the system by pulling the P40 circuit breaker. *See also,* Order, MDL No. 742, October 1, 1991, at 5–10; Order, MDL No. 742, March 19, 1991, at 7–12; Order, MDL No. 742, November 6, 1990, at 12–30.

Since the jury determined that, as between Northwest and MDC, Northwest was 100% responsible for the crash, TI contends that it is entitled to the entry of a summary judgment on the basis of the findings of the jury.

■■■■ Although Northwest contends that many of the choice of law questions are premature, this court believes that an examination of the governing law as to liability is necessary for an issue preclusion analysis.[15] The fora in which the North-

---

**14.** Although MDC also relies upon claim preclusion and the law of the case doctrine, the court declines to base its decision on these grounds.

**15.** The court must identify (1) the issues and claim elements that were litigated in the prior litigation, and (2) the issues and claim elements

that are present or at issue in the subsequent litigation to determine the preclusive effect of the judgment in the first action. For example, if claims of negligence, proximate cause and misrepresentation were decided adversely to a party in the first action, and another party seeks to apply the issue preclusion doctrine in a sub-

west claims have been filed are Michigan, Arizona, California, and Florida.[16] A federal court that sits in diversity matters must apply the choice of law rules of the forum state. *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1942). When a case has been transferred pursuant to 28 U.S.C. § 1404(a), the transferee court must apply the substantive law, including the choice of law rules, of the transferor forum. *Van Dusen*, 376 U.S. 612, 84 S.Ct. 805.

■ In a prior decision in this litigation, this court extensively reviewed the appropriate choice of law analysis for these respective states. *In re Disaster at Detroit Metropolitan Airport on August 16, 1987*, 750 F.Supp. 793 (E.D.Mich.1989). The reasoning of that order, coupled with follow-up orders pertaining to liability choice of law issues, compel the conclusion that the law of Massachusetts, the state in which TI designed and manufactured the subject circuit breaker, should govern the elements of Northwest's product liability claims against TI. *See also* Order, March 30, 1990; Order, February 1, 1991 (establishing that California law governed (1) Plaintiffs' product liability claims against MDC, regardless of the fora in which cases filed, and (2) Northwest's product liability claims against MDC). TI and Northwest agree on this point. Northwest Response to TI Choice of Law Motion, at 2–3; TI Choice of Law Motion, at 8.[17]

As explained in section III(A) of this order, the court will look to the federal law within the Sixth Circuit and not to the circuit law in which the cases were originally filed before being transferred to this court. In addition, the court will follow its decision to apply federal law in order to determine the collateral estoppel effect of a diversity judgment in a subsequent diversity case. *See also Ratliff*, 776 F.Supp. 316. The analysis and result of the court on MDC's summary judgment motion applies with equal force to TI's motion.

■ During the joint liability trial, Northwest contended that MDC's aircraft—including one of its component parts (the P40 circuit breaker)—was negligently manufactured and designed. *See* Order, MDL No. 742 (November 6, 1990) (under seal) (denying Northwest motion for directed verdict); Order, MDL No. 742 (March 19, 1991) (addressing Northwest and MDC cross-motions for directed verdicts); Order, MDL No. 742 (October 1, 1991) (denying Northwest motion for jnov and new trial); Jury Instructions 39–41, 43, 46.

Similarly, in its third-party claims against TI, Northwest contends that the TI circuit breaker was defective in design and manufacture. These issues were (1) fully and fairly litigated over the course of an eighteen month trial, (2) decided adversely to Northwest, and (3) necessary to the amended final judgment, and, moreover, are essential to Northwest's third-party claims against TI. Therefore, the four factors

---

sequent action, it would be necessary for this court to identify the governing law in the second action in order to determine the scope and limitation of the requisite elements. If one claim (for example, negligence) was litigated and necessary to the first judgment and it is an essential element to the second action, the application of issue preclusion would be appropriate to bar that action. *See Marino*, 611 F.Supp. at 854. Conversely, if one element (misrepresentation, for example) was not an essential element of the second action, issue preclusion as to that element would not be a bar to the second action. In the multidistrict litigation, product liability claims vary from negligence to strict product liability, making the choice of law analysis important to determine the essential elements of the claims.

**16.** These include the contribution and indemnity claims that have been filed in the general loss cases and the direct or hull loss claims that Northwest filed against TI, among others, in a separate action in Michigan.

**17.** For the general products liability law of Massachusetts, see *Colter v. Barber–Greene Company*, 403 Mass. 50, 525 N.E.2d 1305 (1988).

A separate question relates to the law to be applied to whether Northwest is entitled to contribution and indemnity (assuming it prevails on its product liability claims). Northwest notes that the Michigan and Massachusetts statutes are similar and have been patterned after the Uniform Contribution Among Tortfeasors Act. Northwest relies upon Michigan law. In view of the decision of the court, this issue is moot.

that are required for the application of defensive issue preclusion have been fully satisfied in TI'S application for dispositive relief. *See Master Slack*, 773 F.2d at 81; *Marino*, 611 F.Supp. at 854.

Accordingly, the court will grant TI's motion for summary judgment in its entirety. Therefore, this court will enter a judgment in favor of TI and against Northwest in all cases, including the so-called hull loss case. TI shall submit an appropriate form of judgment, which shall include an itemized listing of all of the cases that are governed by its provisions.

## V.

On July 16, 1991, NCR filed motions which seek (1) the application of Michigan law to Northwest's claims for contribution and indemnity, (2) the utilization of federal law to the preclusive effect of the jury findings of negligence and willful and wanton misconduct, (3) a ruling that federal law requires these findings by the jury to apply to Northwest's claims, (4) the entry of a partial summary judgment that (a) its light pole conformed to the applicable Building Restriction Line (BRL) and to FAA Regulations (FARs) at the time of the crash, and (b) it was not negligent, (5) a judicial determination in the form of a partial summary judgment that it is not legally obligated to make any contribution to Northwest, and (6) the entry of a partial summary judgment that Northwest cannot recover indemnity from it. Northwest opposes all but the first motion. It also has filed a cross-motion for summary judgment against NCR, to which NCR objects.

On September 11, 1991, Northwest filed a motion for leave to amend its first amended and second amended third-party complaints, as well as its cross claim and hull suit complaint, to assert a claim against NCR based on intentional and negligent nuisance in fact under Michigan law. NCR opposes this motion.

### A.

NCR's first motion is for the application of Michigan law to Northwest's claims for contribution and indemnity. Northwest concurs in this motion. Accordingly, this motion will be granted and Michigan law will govern these claims.

### B.

■ NCR's second motion is for (1) the application of federal law to the preclusive effect of the May 8, 1991 jury verdict and the ensuing amended final judgment, and (2) a ruling that federal law requires that the findings of the jury apply to Northwest's claims against it.

As to the first portion of the motion, and consistent with the analysis in section III(A) of this order, the court will apply Sixth Circuit federal law to determine the preclusive effect of the jury verdict and amended final judgment on these claims.

NCR also contends that the federal standards for issue preclusion have been met as to the findings of Northwest's active negligence and willful and wanton misconduct. The court agrees.

The issues that NCR currently presents and relies upon, Northwest's so-called active negligence and willful and wanton misconduct under federal and Michigan law, were raised and actually litigated in the joint liability trial. *See, e.g.,* Order, MDL No. 742, (November 6, 1990) (under seal) (Northwest directed verdict motion); Order, MDL No. 742 (March 19, 1991) (Northwest and MDC cross-motions for directed verdicts); Order, MDL No. 742 (October 1, 1991) (denying Northwest jnov and new trial motions). Northwest fully, fairly, and contentiously litigated these issues against MDC in that trial. It lost. The jury's determination of these issues against Northwest was critical and necessary to the amended final judgment. *See Master Slack*, 773 F.2d at 81; October 1, 1991 Amended Final Judgment (Attachment C).

The court cannot accept Northwest's contention that issue preclusion should not be applied because of fairness concerns. These identical contentions have been rejected in earlier opinions. *See, e.g., Ratliff*, 776 F.Supp. at 325–26. Accordingly, the jury findings that Northwest (1) was negligent, (2) engaged in willful and wanton

misconduct under federal and Michigan law, and (3) proximately caused the crash of Northwest Flight 255 on August 16, 1987 shall apply to the claims that Northwest has asserted against NCR. The effect of these findings will be addressed in subsection D, *infra.*

### C.

In its third motion, NCR moves for a partial summary judgment "because at the time of the air crash, National Car Rental's light pole conformed to the applicable Building Restriction Line and to FAA safety regulations and, therefore, was not negligent." NCR Motion for Summary Judgment (Motion No. 3), at 1. Northwest opposes this motion. The success or failure of the motion depends upon which version of the safety regulations is applicable to this controversy.

In each of its complaints, Northwest alleges that NCR carelessly and negligently failed to comply with the mandatory requirements of FAA Advisory Circulars 150/5300–12 and 150/5300–4B. *See, e.g.,* Northwest Complaint, ¶ 104 (Aug. 14, 1989) (attached as Exhibit 2 to NCR's Appendix). Northwest contends that, but for NCR's negligent construction of the lightpole within the mandatory Building Restriction Line (BRL) of Change 8 to Advisory Circular 150–5300–4B, Northwest Flight 255 would not have struck the lightpole and would not have crashed. *Id.* at ¶¶ 106–07. NCR contends that the Change 8 standards did not apply to its light pole.

#### 1. Uncontested Facts [18]

The NCR facility, including its light poles, was built as part of a larger Airport Improvement Project (AIP). One of North-

west's FAA experts, Carl Steinhauer, testified about the procedure for federal funding of AIPs generally:

[A]n airport sponsor, either directly or through another party, applies for federal assistance funds pursuant to the Airport and Airway Improvement Act of 1982 ("AAIA"), 49 U.S.C.App. Section 2201 *et seq.* The FAA evaluates the application, and if it decides to participate financially, makes a tentative allocation of federal funds for the AIP project. The tentative allocation of funds permits the airport sponsor to commence preparation of construction plans and specifications, which are then submitted to the FAA for review and approval. Subsequently, bids are let for the items to be constructed. Thereafter, the FAA makes an offer of grant for federal funds. As construction progresses, funds are paid out to reimburse the Airport Sponsor for costs incurred.

Plans for proposed construction on and in the vicinity of airports that are not federally funded must be submitted by the applicant to the FAA through FAA Form 7460–1, Notice of Proposed Construction. If upon review the FAA issues a finding of "No Objection," then such project can be constructed.

Steinhauer Declaration, Northwest Appendix, Exhibit 1, at 2–3.

What follows are some of the FAA provisions that are pertinent to the construction of the NCR facility and the placement of its light pole. On August 3, 1979, FAA Order 5100.36, the Airport Development Aid Program (ADAP) Handbook, became effective. *See* Trial Exhibit 459.[19] Paragraph 402(b) of this order provides:

FAA orders and advisory circulars are referred to in this directive....
The ADAP was authorized by the Airport and Airway Development Act of 1970 (Public Law 91–258, as amended), the objective of which was to assist public agencies in the development of a nationwide system of public airports that would be sufficient to meet expected growth of civil aviation projects at airports that were a part of the National Airport System Plan (NASP). Trial Exhibit 459, at 4.

---

**18.** NCR and Northwest have presented separate versions of the "uncontested facts." However, not all of the facts are uncontested.

**19.** The foreword reads:
[t]his order provides guidance and sets forth policy and procedures to be used in the administration of the Airport Development Aid Program (ADAP). The order consolidates a number of existing directives and incorporates changes in law and policy that were not reflected in the existing orders. Several other

The applicable programming design and construction standards are those in effect on the date of allocation of ADAP funds. Standards that become effective after date of allocation may be applied to the project by mutual agreement.

On May 22, 1980, FAR 152.11(a) incorporated by reference Advisory Circulars 150/5300-4B and 150/5300-12 and made them mandatory standards for airport planning and development. *See* Trial Exhibit 455.

On September 3, 1982, the Airport and Airway Improvement Act of 1982 (AAIA), 49 U.S.C.App. § 2201-2227, superseded the AADA. On September 4, 1982, the FAA issued Program Guidance Letter No. 6, Trial Exhibit 452, which transmitted a new FAA Form Grant Agreement and Form Part V Sponsor Assurances. The letter also directed the regional offices of the FAA to use the standards that had been set forth in FAR Part 152, FAA Order 5100.36, and applicable Advisory Circulars for program implementation and compliance under the AAIA. *Id.*

On May 25, 1983, the Detroit Metropolitan Airport, through Wayne County and the Wayne County Road Commission (sponsor), made a pre-application for federal assistance funds for Airport Improvement Project No. 3-26-0026-0283 (the project). *See* Trial Exhibit 457(a). Included in the project was the construction of a Northeast access road and lighting. The road was intended to provide access from Middlebelt Road to the new rental car facilities which were to be relocated from other sites. 1*Id.* Neither the project nor its federal funding included the costs of construction of the new rental car facilities. Rather, the pre-application, the application, and the grant provided for the general location of the new rental car facilities but without any specifics as to their construction. *Id.;* Steinhauer Declaration, ¶¶ 6-7.

As part of its pre-application, the sponsor represented in a letter to the FAA that [p]ursuant to Federal Aviation Regulations, Part 152, as amended, and as a condition to receiving any Federal assistance, through a Grant Offer from the FAA for the proposed Airport Improvement Project (AIP) No. 3-26-0026-02/83, it is hereby certified that the Wayne County Road Commission will adhere to the requirements established in the Attached Part V Assurances.

It is understood that these assurances are applicable only if a Grant Offer is accepted by the Wayne County Road Commission.

Exhibit 457(a) (Letter from Joseph N. Hartmann to Robert F. DeRoeck, May 25, 1983). Some of the relevant assurances, to which the sponsor certified adherence, included (1) compliance with the AAIA (Assurance 1(*o*)), (2) maintenance of the airport pursuant to the applicable federal standards (Assurance 11), (3) removal of existing airport hazards and the prevention of future airport hazards (Assurance 12), and (4) maintenance of the Airport Layout Plan (ALP) up to date (Assurance 29).

On July 18, 1983, the airport sponsor applied for federal funds for AIP No. 3-26-0026-0238. Trial Exhibit 457(c). Two days later, on July 20, 1983, the FAA tentatively allocated Airport Improvement Funds to the sponsor pursuant to the AAIA. *See* NCR Statement of Uncontested Facts (SOUF) Nos. 1-2; Steinhauer Declaration, ¶ 8; Trial Exhibit 457(b). The tentative allocation made the offer of the grant contingent upon all applicable federal requirements being met, including the requirements of FAR Part 152.

On September 9, 1983, the FAA made an offer to grant federal funds for the project. Trial Exhibit 457(c). On September 15, 1983, the sponsor accepted the grant offer. *Id.* By accepting the grant offer, the sponsor ratified and adopted "all statements, representations, warranties, covenants and agreements contained in the Project Application and incorporated materials referred to in the foregoing Offer," and "agree[d] to all of the terms and conditions thereof," including the Part V Assurances. *Id.*

On May 8, 1984, the Project Grant Agreement was revised in two ways, both of which were unrelated to the Northeast road construction portion. The revision noted that "all other terms and conditions of the grant agreement remain in full force

and effect." The sponsor accepted the revisions on June 22, 1984.

On October 1, 1984, the FAA announced the Grant Assurances that were applicable to those Grant Agreements that were issued after October 1, 1984. *See* Trial Exhibit 454 (49 Fed.Reg. 35,282 (Sept. 6, 1984)).

The sponsor submitted a revised ALP for the Detroit Metropolitan Airport, dated December 3, 1984, to the FAA for its approval. The ALP was approved by the FAA on December 17, 1984. *See* Trial Exhibit 457(d). Sheets 3, 12, and 13 of that ALP depicted the proposed location of the Northeast access road and the relocated rental car facilities but did not include any plans that detailed the construction of the NCR facility or its light poles. *See* Steinhauer Declaration, ¶ 6. One provision of the ALP approval letter reads that "[a]ctual facility development will be governed by adherence to development standards applicable at the time the development is undertaken." Trial Exhibit 457(d). Another portion notes that

> [a] review of the landing area development proposed on the plan was conducted in accordance with Parts 77, 152, and 157 of the Federal Aviation Regulations (Aeronautical Study No. 02–ACL–732–NPA).... Based on considerations of safe and efficient use of airspace, the FAA offers no objection to the proposed ultimate airspace utilization as depicted on the development plan. The development plan will be afforded the status of a plan on file for the purpose of the Federal Aviation Regulation Part 77 obstructions evaluations or Part 152 airport aid program.
>
> Due to insufficient information regarding planned development, this review did not include an evaluation of actual construction for which separate notice is required under Part 77 of the Federal Aviation Regulations. Prior to constructing any facility, structure, or other items on the airport, notice consistent with requirements of Part 77 must be filed and evaluated (FAA Form 7460–1 or Pre-application for Federal Assistance).

FAA Order 5100.38 became effective on February 11, 1985. This order governed the handling of grants under the AAIA but did not contain any language which stated that the applicable regulations were those in effect at the time of the allocation of federal funds. *See* Trial Exhibit 456.

Change 1 to Order 5100.38, which became effective on June 5, 1985, added language that "[s]tandards which became effective after the date of allocation may be applied to the project by mutual agreement between the FAA and the Sponsor." *See* Trial Exhibit 456, at 12–1.

On November 16, 1984, James Bushee, the Manager of the FAA's Design and Operations Criteria Division, Office of Airport Standards, circulated a draft version of Change 8 to AC 150/5300–4B for comment. *See* Trial Exhibit 458. Change 8 proposed extending the BRL to 3,000 feet beyond the end of the runway. The change was in connection with a revision of the definition of "airport hazard." *See* Trial Exhibits 458, 464. Prior to Change 8, the BRL extended beyond the end of the runway until it intersected the clear zone. *See* Trial Exhibits 438, 441.

The FAA circulated the proposed Change 8 for comment to all FAA Regional Offices. One of those offices, the Great Lakes Regional Office, in turn circulated it to various Airport District Offices (ADO's) within its region, including the Detroit ADO. The FAA also distributed the proposed change for comment to interested aviation and professional organizations. The interested parties were invited to submit comments between December 3, 1984 and May 11, 1985. *See* Trial Exhibit 458.

On December 14, 1984, the Detroit ADO, in its response to the FAA invitation, recommended the application of a "very strict interpretation" of airport hazard rules: "Any facility ... that would involve the use by people for living, working, leisure or recreational purposes should be removed because they are hazards. We must not have any gray areas in these revised definitions." Trial Exhibit 473, at 9.

On July 2, 1985, Bushee recommended that Leonard Mudd, the Director of the

FAA's Office of Airport Standards, approve the proposed Change 8. In his transmittal memorandum to Mudd, and in the attached "Disposition of Substantive Comments," Bushee addressed several of the responsive comments by FAA officials that had been directed at (1) the proposed definition of "airport hazard," and (2) the requirement that airport hazards "must be removed." The Great Lakes Region had suggested that the term "airport hazard" be discontinued, a position that Bushee rejected "[s]ince statutes obligate airport sponsors to eliminate airport hazards." Trial Exhibit 458, at 4.

On July 3, 1985, Change 8 to AC 150/5300–4B became effective. It extended the BRL to 3,000 feet from the departure end, and 750 feet to each side of the runway centerline, of Runway 3C. *See* Trial Exhibits 461, 464. On August 23, 1985, the Detroit ADO received formal notice of Change 8. *See* Trial Exhibit 449(f).

On August 30, 1985, NCR prepared a FAA Form 7460–1 (form) for construction of its rental car facility at the airport, including the subject light pole. *See* Trial Exhibit 449(d)(2). This form listed the distance from the light pole to the runway as 3,000 feet but noted the distance as being 2,000 feet south of Wick road and 1,000 feet west of Middlebelt road. The form also recorded the height of the light pole as 40 feet. In addition, NCR prepared a Form 7460–1 Notice of Proposed Construction for the temporary location of the construction equipment that would be necessary for the project. *See* Trial Exhibit 449(d)(1). The FAA received the NCR form on April 18, 1986. *See* Trial Exhibits 449(d)(2), 449(f).

On June 13, 1986, NCR and Wayne County (the sponsor) entered into a building site lease. *See* NCR Appendix, Exhibit 24. The lease provides that the "lease is subordinate to the terms, conditions and covenants of any existing or future agreements between [Wayne County] and the United States of America relative to the operation and maintenance of the Airport, the execution of which has been or may be required

as a condition precedent to the expenditure of federal funds for the development of the Airport." *Id.* In addition, the lease requires NCR to "comply with all applicable federal and state laws and regulations." *Id.* ¶ 30.

On July 2, 1986, following its review of the NCR project proposal, the FAA issued a "no objection" determination and approved NCR's Form 7460–1 construction applications. *See* Trial Exhibits 449(d)(2) and (1). In response to the application query, "Does this construction violate the BRL?", Leonard Mizerowski, the FAA approving official, answered "No." *See id.* The FAA made the following findings:

(a) NCR's proposed construction did not exceed any FAR Part 77 requirement. Specifically, the FAA determined that the construction did not constitute an obstruction prohibited by FAR Part 77.-25(a)(b)(c)(d) and (e).

(b) The proposed construction did not exceed an obstacle free zone surface, was not located on a runway safety area, and was not inside the building restriction line (BRL).

NCR Appendix, Exhibit 12, ¶¶ 1–4 (Airspace Case No. 86–AGL–664–NRA, Surface Structures On Federally Obligated Airports, incorporating Airspace Study dated May 5, 1986).

On August 16, 1987, the accident aircraft struck a light pole that had been constructed within the NCR facility pursuant to its proposal to the FAA. The top of the light pole was 40–42 feet above ground and located 2,760 feet from the departure end of Runway 3C and 50–100 feet from the runway center line. The accident aircraft struck the pole at a height of approximately 36 feet 6 inches or 41 feet 4 inches.[20]

The parties agree that (1) under the FAA standards that were promulgated before Change 8, the location of the NCR light pole did not violate the BRL, and (2) under Change 8, if applicable, the location of the light pole did violate the BRL. Thus, the question is whether Change 8 applies to the NCR light pole.

20. The parties may have a dispute as to some of these figures. However, they are not material

for the purposes of the motions, and NCR has accepted the higher figures for this motion only.

NCR takes the position that its placement of the light pole conformed to those applicable federal standards that were in effect in September of 1983 when the FAA approved the AIP with which the construction of the NCR facility, including the light pole, was associated. These standards were contained in FAA Advisory Circular 150/5300–4B, as amended through Change 7.

Relying in part upon its FAA expert, Carl Steinhauer, Northwest contends that the applicable federal standards were those in effect on and after April 18, 1986 when the FAA reviewed and approved the actual construction plans for the NCR facility. These standards were contained in Advisory Circular 150/5300–4B, as amended through Change 8, which became effective on July 3, 1985. From Northwest's perspective, the NCR facility and its light pole constituted "airport hazards" under the Change 8 standards, and, as a consequence, should not have been built and should have been removed.[21]

### 2. Analysis

The court cannot hold, as a matter of law, that the Change 7 BRL (1,900 feet) applied to the construction of the NCR facility and its light pole. NCR places principal reliance upon what it labels a uniform and general rule that, once the FAA allocates funds to a proposed project by a sponsor, all construction standards that are in effect as of that date "lock in" unless modified by a mutual agreement at a later time. Since the FAA and the sponsor finalized the allocation of funds for AIP 3–26–0026–0283 on September 15, 1983, a date when Change 7 was still in effect, NCR contends that Change 7 applied to its anticipated car rental facility.

At the outset, to a lay person who is not versed in the FAA regulatory scheme, the FAA orders and regulations for airport improvement projects contain vague, confusing, and, at times, seemingly inconsistent language, all of which is compounded by their inclusion in a multiplicity of forms.

Nevertheless, upon reviewing the pertinent exhibits and affording them their common sense meanings, it is clear to the court that Change 8 applied to the construction of the NCR light pole.

As the statutory and FAA regulatory scheme for AIPs reveals, a sponsor who seeks federal funding for an improvement project must submit various forms and proposals to the FAA for review and approval. In the matter before this court, Wayne County, as a sponsor, submitted a detailed AIP in which it sought federal funds for five specific improvement projects at the Detroit Metropolitan Airport:

(1) Overlay CFR and Maintenance Roads (Approx. 18,000 L.F.)

(2) Rehabilitate General Aviation Taxiway, Edge Lighting and Marking (Approx. 12,000 S.Y.)

(3) General Aviation Site Development (Approx. 16 acres) Including Taxiways, Taxilanes, Ramp, Edge Lighting, Marking and Drainage.

(4) Construct Northeast Access Road and Lighting (Approx. 3,600 L.F.)

(5) Reconstruct Concrete Pavement on North and West Aprons and at Terminal Gates 30 and 40 (Approx. 3,550 S.Y.)

*See* Trial Exhibit 457(a). It is significant to note that this funding proposal did not include the actual development of rental car facilities, even though it would have ostensibly aided in their expected development. At best, the project, for which the sponsor sought federal funding, identified the area within which rental car facilities could relocate. Thus, the development of rental car facilities would have been a separate "project" for which separate funding, notice, and FAA approval would be required.

FAA Order 5100.36 by its own terms applies to (1) a project, (2) which is to be federally funded, (3) between an airport sponsor and the FAA. NCR was not, and could not have been, a part of the AIP for

---

**21.** The court took judicial notice, F.R.E. 201, of the AAIA, as well as FAR § 152.11(a) and Advisory Circulars 150/5300–4B and 150/5300–12, during the liability trial. *See* Tr. Transcript, December 12, 1990, at 111–12.

which federal funds were supplied. Accordingly, the language upon which NCR relies—"The applicable programming design and construction standards are those in effect on the date of allocation of ADAP funds. Standards that become effective after date of allocation may be applied to the project by mutual agreement."—is not of controlling importance. As of September 15, 1983, NCR (1) was not a part of the Detroit AIP, (2) had not made a commitment to relocate its rental car facilities, (3) had no building site lease with Wayne County, and (4) had not submitted its Form 7460–1 to the FAA for a proposed construction of its facilities.

Moreover, the FAA approval letter of Detroit's ALP, which depicted only the location of the Northeast access road and the space for rental car facilities, advised that the "actual facility development will be governed by adherence to development standards applicable at the time the development is undertaken." Trial Exhibit 457(d).[22] A traditional maxim of statutory interpretation is that specific rules govern over general rules. *See Bulova Watch Co. v. United States*, 365 U.S. 753, 758, 81 S.Ct. 864, 867, 6 L.Ed.2d 72 (1961). The import of this language is that the standards in effect on the date of the FAA review and approval of the specific project will govern the facility development. After all, it is a building restriction line that is being applied. This interpretation is consistent with the only expert testimony that has been offered. *See* Steinhauer Declaration, ¶¶ 14–15.[23]

Change 8 became effective on July 3, 1985. The Detroit Airport District Office (ADO) received formal notice of this new mandatory building restriction line on August 23, 1985. Nothing in the record demonstrates that NCR and Wayne County or the FAA had any kind of arrangement or agreement with regard to the precise relocation of its rental car facilities prior to this date, much less any agreements with regard to building sites and construction details. The Wayne County–NCR building site lease indicates that five sites existed for the relocation of rental car facilities, one of which was selected by NCR in June of 1986, well after the effective date of the Change 8 BRL and after the Detroit ADO received notice of it.

In fact, NCR did not submit the requisite Form 7460–1 to the FAA for approval of its relocated facility until August 30, 1985— nearly two months subsequent to the effective date of Change 8. NCR and Wayne County did not enter into their building site lease for the car rental facility until June 13, 1986. The FAA did not issue its "No Objection" to the NCR form until July 2, 1986 and not until November of 1986 did NCR build its facility and install the subject light pole.

Evidence that the FAA approved of the NCR facility and its placement of the light pole is not binding upon Northwest or this court. Even though the FAA form indicated that the proposed construction did not violate the BRL, subsequent reports imply that the FAA may have erred in its conclusion. At one time, the FAA was a party-defendant in this case. After the accident, Gerald Trout, the manager of the Detroit ADO at the time of the approval of NCR's Form 7460, queried in response to a telephone discussion about the approval,

---

**22.** This language can be read as constituting a "mutual agreement" between the FAA and the sponsor in accordance with FAA Orders 5100.36 and 5100.38. The court notes the use of the phrase "programming design and construction standards" in 5100.36 and 5100.38 and the phrase "development standards" in the ALP approval letter.

**23.** Steinhauer asserts that

[t]he statement, "[a]ctual facility development will be governed by adherence to development standards applicable at the time the development is undertaken," is an agreement

between the FAA and the Detroit Airport that the development of facilities included for planning purposes in the ALP would be governed by development standards applicable when actual facility development was undertaken in the future. Thus, the FAA development standards applicable to NCR's proposed car rental facility were those in effect when the FAA reviewed for approval the Form 7460–1 from the applicant, not the development standards previously in effect at the time of tentative allocation of federal funds. Steinhauer Declaration, ¶ 15.

"[w]hy did ADO not object to this [the proposed construction] since it violated BRL as defined in AC 150/5300–4B Chg 8 and AC 150/5300–12?" He also commented that "[w]e need to come up with something (basis for decision) that is defensible." Trial Exhibit 449(f), at 3. Furthermore, this court cannot accept NCR's proposition that it is entitled to those standards in effect on the date of fund allocation for a project with which it was collaterally associated because to do so would lead to unreasonable results.[24]

Wayne County had planned to make five sites available for the relocation of rental car facilities. The mere fact that the airport sponsor in 1983, with some apparent tacit understanding with rental car companies, had set aside five locations for anticipated rental car facilities in connection with a specific project does not mean that the construction and development of those sites are governed by 1983 standards. The BRL, as with many other mandatory FAA regulations, is concerned with safety. Concerns about safety should be progressive, not static, and not the subject of what would amount to a grandfather clause for rental car facilities.

This analysis ties in with the obligation of the sponsor, and of NCR pursuant to its lease with the sponsor, to comply with all federal and state laws and regulations, including the obligation to remove existing airport hazards and to prevent the establishment or creation of future airport hazards. Under Change 8, the NCR light pole was within the BRL on August 16, 1987, and, therefore, it was an existing airport hazard that should have been removed.

■■■ Accordingly, the court will deny NCR's motion for a partial summary judgment (Motion No. 3). However, this court will not grant Northwest's cross-motion in its entirety because, after a review of the record in this cause, it has only determined that Change 8 applied to the placement and construction of the light pole. Under Michigan law, the violation of a federal regulation constitutes mere evidence of negligence. Genuine issues of material fact still exist as to whether the placement of the light pole constituted an act of negligence on the part of NCR and, if so, whether its conduct was a proximate cause of the accident. Northwest's direct loss claims against NCR, i.e., the hull suit, will be allowed to continue.

### D.

NCR's fourth motion seeks a judicial determination in the form of a summary judgment that Northwest cannot recover on its contribution claims. In support of its motion, NCR contends that (1) the jury's finding of willful and wanton misconduct, to which the court has given preclusive effect in these claims, bars recovery under Michigan law, and (2) Northwest failed to comply with the statutory prerequisites for contribution claims.[25] In its responsive pleading, Northwest asserts that (1) the finding of willful and wanton misconduct cannot be equated with an intentional tort, and only intentionally tortious conduct would bar its claim to contribution, and (2) on the basis of Carroll E. Dubuc's Declaration, it has complied with the statutory requirements to preserve its right to obtain contribution from NCR.

■■■ Under Michigan law, the right to contribution flows from, and is controlled by, statute because "there was no right to contribution at common law." *Reurink Bros. Star Silo, Inc. v. Clinton County*

---

**24.** Hypothetically, assume that only NCR, Avis, and Hertz decided to build their facilities in 1985 or 1986, leaving two available locations. Assume further that another rental car company proposed to Wayne County and the FAA to relocate its rental car facilities in 1990, or that an outside competitor wanted to take over NCR's existing facility and intended to install additional light poles. Under NCR's scenario, these new or additional constructions would be governed by the BRL (and ostensibly other standards) in effect in 1983, when the allocation of federal funds for the Detroit AIP was finalized. This in futuro application of 1983 standards, similar to covenants that run with the land, is unsupportable given the safety implications.

**25.** NCR also relies upon its compliance with FAA regulations. However, since the court denied NCR's motion on this point, section IV(C), it is of no help to NCR in this motion.

*Road Commissioners*, 161 Mich.App. 67, 70, 409 N.W.2d 725 (1987). The Michigan Contribution Act reads, in relevant part:

**Right of contribution among joint or several tortfeasors.** (1) Except as otherwise provided in this act, when 2 or more persons become jointly or severally liable in tort for the same injury to a person or property or for the same wrongful death, there is a right of contribution among them even though judgment has not been recovered against all or any of them. **Conditions.** (2) The right of contribution exists only in favor of a tortfeasor who has paid more than his pro rata share of the common liability and his total recovery is limited to the amount paid by him in excess of his pro rata share. A tortfeasor against whom contribution is sought shall not be compelled to make contribution beyond his own pro rata share of the entire liability.

*Mich.Comp.Laws Ann.* § 600.2925a (West 1986) (Act). Michigan courts have ruled that an intentional tortfeasor may not recover contribution under the Act. For example, in *Johnson v. Bundy*, 129 Mich. App. 393, 400, 342 N.W.2d 567 (1983), the court indicated that "[c]ontribution is not available to a party who causes injuries or damages by way of an intentional tort." *See Salim v. LaGuire*, 138 Mich.App. 334, 361 N.W.2d 9 (1984) (same); *Allstate Insurance Co. v. Wayne County*, 760 F.2d 689, 697 (6th Cir.1985) (same).

In *Nunn v. Drieborg*, 235 Mich. 383, 386–87, 209 N.W. 89 (1926), the Michigan Supreme Court reasoned:

The claim of the plaintiff ... is that the defendant intentionally drove over the decedent without just cause or excuse. If he did so, his act would be wilful and malicious and he would be liable for "Wilful and malicious injury." "Wilful" means intentional. But by this it is not meant that in order that the act be intentional or willful, the defendant must have deliberately willed to drive over the decedent ... If it is intentional it is not negligence. "When wilfulness comes in the door, negligence goes out through the window." But the law imputes to one an intention to do harm who does an act wantonly and in reckless disregard for the safety of others.

*See Moyses v. Spartan Asphalt Paving Co.*, 383 Mich. 314, 334, 174 N.W.2d 797 (1984) ("[W]e have decided to overrule what is left of Michigan's common-law bar of contribution between or among 'wrongdoers,' *wilful or intentional wrongdoers excepted.*") (emphasis added); *Caldwell v. Fox*, 394 Mich. 401, 418–19, 231 N.W.2d 46 (1976) (rule denying contribution in favor of negligent tortfeasors in full retreat; however, "[a]s to willful wrongdoers, or those who are guilty of the more flagrant forms of misconduct, there is no indication of any desire or tendency to relax the original rule.").

Thus, the issue becomes whether Northwest is the equivalent of a willful or intentional wrongdoer, thus barring its right to claim contribution from NCR. The court believes that the findings of the jury that Northwest engaged in willful and wanton misconduct under Michigan and federal law are synonymous with, and the equivalent of, a "willful or intentional wrongdoer" under Michigan law.

This court charged the jury at the conclusion of the liability trial that willful or wanton misconduct exists under Michigan law if it found that:

(1) Northwest Airlines knew of a situation which required the exercise of ordinary care and diligence to avert injury to another;

(2) Northwest Airlines had the ability to avoid the resulting harm by ordinary care and diligence in the use of the means at hand; and

(3) Northwest Airlines failed to use such care and diligence to avert the threatened danger when, to the ordinary mind, it would have been apparent that the result was likely to prove disastrous to another.

The court also instructed the jury that willful misconduct under federal law is defined as (1) the intentional performance of an act, or the failure to act, with the knowledge that it will probably result in an injury or a harm, or (2) the intentional performance of

an act, or failure to act, in some manner as to imply a reckless disregard of the consequences of its performance. *See* Jury Instructions No. 35 and 36, (NCR Appendix, Exhibits 25–26). *See also* Order, MDL No. 742 (E.D.Mich. Feb. 4, 1991); Order, MDL No. 742 (E.D.Mich. Nov. 6, 1990). These latter orders establish that a finding of willful and wanton misconduct is the legal equivalent of intentional wrongdoing under Michigan law.[26]

In *Gibbard v. Cursan*, 225 Mich. 311, 321, 196 N.W. 398 (1923), the case from which the court in part crafted its jury instruction, the court noted:

> One who is properly charged with recklessness or wantonness is not simply more careless than one who is only guilty of negligence. His conduct must be such as to *put him in the class* with the wil[l]ful doer of wrong. The only respect in which his attitude is less blameworthy than that of the intentional wrongdoer is that, instead of affirmatively wishing to injure another, he is merely willing to do so. The difference is that between him who casts a missile intending that it shall strike another and him who casts it where he has reason to believe it will strike another, being indifference whether it does so or not.

(quoting *Atchison R. Co. v. Baker*, 79 Kan. 183, 98 P. 804 [1908] ) (emphasis added); *see O'Dowd v. General Motors Corp.*, 419 Mich. 597, 603 n. 11, 358 N.W.2d 553 (1984) ("Common law bar against 'recovery of contribution by a willful or intentional tortfeasor was retained.' "). Thus, under the prior orders of this court and the jury instructions, the finding by the jury that Northwest engaged in willful and wanton misconduct applies to Northwest's contribution claims against NCR and precludes it from recovering contribution.

NCR shall submit an appropriate judgment in the applicable cases.

■■■ The second portion of NCR's motion is that Northwest failed to comply with the requirements of the contribution statute. Subsection (3) of the Act provides that

> A tort-feasor who enters into a settlement with a claimant is not entitled to recover contribution from another tort-feasor if any of the following circumstances exist:
>
> (a) The liability of the contributee for the injury or wrongful death is not extinguished by the settlement.
>
> (b) A reasonable effort was not made to notify the contributee of the pendency of the settlement negotiations.
>
> (c) The contributee was not given a reasonable opportunity to participate in the settlement negotiations.
>
> (d) The settlement was not made in good faith.

*See Reurink Bros. Star Silo, Inc.*, 161 Mich.App. at 72, 409 N.W.2d 725.

NCR submits that "Northwest never provided NCR ... with notice of the pendency of any specific settlement negotiations or with any opportunity to participate in any specific settlement negotiations. (*See* Affidavit of John M. Benzian, Appendix, Ex. 27.)." NCR Motion No. 4, at 10. Accordingly, NCR argues that Northwest cannot recover contribution in the applicable cases.

On the other hand, Northwest maintains that it did comply with the statutory requirements. *See* Dubuc Declaration. It is Northwest's position that it has provided

---

26. The parties spent considerable time addressing what level of conduct would supervene the Northwest exculpatory clause and the limitation of liability within the Warsaw Convention, focusing upon the labels, as well as the definitions of, "gross negligence" and "willful and wanton misconduct." After considerable research and review, the court decided under Michigan law to use the phrase willful or wanton misconduct and the elements listed above. *In re Air Crash at Detroit Metropolitan Airport, Detroit, Michigan on August 16, 1987*, 756 F.Supp. 321 (E.D.Mich.1991); *see also Daniels v. Williams*, 474 U.S. 327, 334, 106 S.Ct. 662, 666, 88 L.Ed.2d 662 (1986) ("What's more, requiring complainants to allege something more than negligence would raise serious questions about what 'more' than negligence—intent, recklessness or 'gross negligence'—is required ... and indeed about what these elusive terms mean.... ('what terms like willful, wanton, reckless or gross negligence mean' has 'left the finest scholars puzzled').... [M]any branches of the law abound in nice distinctions that may be troublesome but have been thought nonetheless necessary.").

NCR with a release which extinguishes its liability in each settlement. *Id.* ¶ 11. Thus, Northwest believes that NCR is only complaining about the alleged failure (1) to notify it of the pendency of settlement negotiations, and (2) to give NCR a reasonable opportunity to participate in those negotiations. These contentions, according to Northwest, are without any factual foundation.

The dispute revolves around a series of letters between counsel for Northwest and NCR. Following the accident, the counsel for Northwest wrote to NCR and other potentially responsible parties on December 16, 1987 and advised each of them that approximately 30 lawsuits had been filed and numerous other lawsuits or claims were anticipated. Northwest also informed NCR that:

> AAU [Northwest's insurer] intends to settle as many of these lawsuits and claims as possible. AAU believes that entering into such settlements will work to the benefit of all parties by avoiding litigation costs and delay and resolving the lawsuits or claims as quickly as possible....
>
> ....
>
> In any settlement, Northwest/AAU will obtain a release of all claims against any person or company (and not just claims against Northwest) based on the accident. Northwest/AAU will also reserve any right to contribution or indemnity it may have against other parties who may be responsible for the accident.
>
> In order to proceed with settlement discussions without having to wait for a determination as to the persons or parties who may bear responsibility for the accident, we ask for your acknowledgement that AAU intends to attempt to enter into settlements with claimants and your agreement that you will not contest Northwest/AAU's right to contribution/indemnity on the grounds that (1) the settlement terms were not reasonable; (2) you were not notified of the pendency of the settlement negotiations; (3) you were not given a reasonable opportunity to participate in the negotiations; or (4) Northwest/AAU acted as a

volunteer in entering any settlement.... You will of course be free to contest any claim by Northwest/AAU for contribution/indemnity on any other ground including that you bore no responsibility for the accident. The proposed acknowledgement and agreement will merely allow the settlement process to proceed without having to resolve the question of responsibility for the accident.

Letter from Carroll E. Dubuc to Joseph W. James, December 16, 1987 (NCR, Appendix, Exhibit 28) (Dubuc Letter # 1). NCR, through its attorney, responded that "[i]t is National Car Rental's position that it was not responsible in any manner for the accident in question; therefore, we will not agree to any of the agreements proposed in your letter of December 16, 1987." Letter from Carl Greenberg to Carroll E. Dubuc, March 1, 1988 (NCR Appendix, Exhibit 29).

On March 7, 1988, Northwest responded to NCR's letter, noting "a misunderstanding somewhere in the process."

> As outlined in my letter, we are presently defending approximately 90 lawsuits arising out of the Northwest Airlines accident, and we expect an additional 50 or 60 lawsuits to be filed. We are evaluating these claims and in many instances making offers where appropriate in an attempt to settle the issues between Northwest and various claimants.... Furthermore, we are a long way in the litigation process from determining or establishing liability.
>
> However, out of an abundance of caution, we have alerted several corporate entities which might be the subject of lawsuits filed by plaintiffs or other third-parties because of facts developed during the investigation of our attempts to settle these lawsuits. We have also sought to enlist their assistance in eliminating some of the issues that might otherwise preclude those settlements (unreasonableness, lack of notice, volunteer issues, etc.) You should know that to date we have received acknowledgements and agreements from numerous corporations that were given a notice similar to the one in our letter dated December 16,

1987.... They have reserved their rights with respect to any exposure, but nevertheless, consented to the concept wherein Northwest would proceed to settle as many of these cases as possible and agreeing not to raise the issues set forth in our letter.... Northwest is reserving its own rights, but nevertheless it is not immediately involving all of those corporations in the legal proceedings.

We would hope that upon review, you would also agree that consent to the settlement process (with a reservation of rights as to liability) would be in the best interests of your client....

Letter from Carroll E. Dubuc to Carl Greenberg (March 7, 1988) (NCR Appendix, Exhibit 30) (Duboc Letter # 2).

On August 3, 1988, Northwest informed NCR about three categories of decedents for which it claimed special defenses that were unavailable to other actual or potential defendants: (1) Northwest's flight crew (workers' compensation defense), (2) Northwest employees travelling on off-duty passes (employee flight pass defenses), and (3) passengers who were travelling internationally under the Warsaw Convention (Warsaw limitation of liability defense). Northwest asked NCR to agree that Northwest need not contribute more than the limited amounts for which it would be responsible in the event of an adverse verdict under a simple negligence theory. Letter from Carroll E. Dubuc to Carl Greenberg, August 3, 1988 (Duboc Letter # 3). NCR answered by asserting that it was "unwilling to enter into any proposed agreement as outlined in your letter of August 3, 1988, as to the method of settlement negotiations; the amount of contribution made or any other aspect of settlement entered into by Northwest/AAU in an attempt to resolve the claims arising out of the August 16, 1986 crash." Letter from Carl Greenberg to Carroll E. Dubuc, September 14, 1988 (NCR Appendix, Exhibit 31).

On October 23, 1989, Northwest wrote to NCR and indicated that

there is a reasonable possibility that through Judge Bechtle's efforts, most of the cases involving plaintiff passenger claims against Northwest will become the subject of a global settlement.... We anticipate that if this global arrangement is finalized, there will be a good faith hearing before Judge Bechtle within the next week or ten days.

You are invited to participate in the proposed global settlement on behalf of your client. Northwest anticipates that it will be given general releases which will include your client, and thereafter if you have not chosen to participate, Northwest thereafter will pursue its rights for contribution/indemnity.

Letter from Carroll E. Dubuc to Carl Greenberg, October 23, 1989 (NCR Appendix, Exhibit 32) (Duboc Letter # 4). NCR declined the invitation. Letter from Carl Greenberg to Carroll E. Dubuc, October 25, 1989 (NCR Appendix, Exhibit 33).

Placing the statutory requirements against the Northwest letters, the court finds that there is no persuasive evidence that Northwest did not make a reasonable effort to notify NCR of the pendency of settlement negotiations. The reasonableness inquiry cannot be proceed in a vacuum, but it must progress from the case by case context within which the issue arises—in this case, complex multidistrict litigation involving over 150 individual suits.

In this context, Northwest, aware of many actual suits and expecting more, informed NCR that it intended to settle as many of the claims as it could. *See* Dubuc Letter # 1. NCR is correct in its characterization of this letter as making demands that it found to be unacceptable. However, NCR has failed to establish that this letter was not an attempt by Northwest to notify it of an intention to enter into settlement negotiations in all cases. Northwest's subsequent letter informed NCR of pending settlement negotiations, even though they were not specified on a case by case basis. *See* Dubuc Letter # 2. To each of Northwest's letters, NCR resisted and, thereby, effectively closed all doors of communication that Northwest had, at a minimum, left ajar.

Subsection (1) of the statute, which NCR charges Northwest with having violated, only requires a reasonable effort by the contributor to inform the contributee of settlement negotiations. Giving the Northwest letters a favorable reading, as must be done under the summary judgment standard, this court concludes that Northwest notified NCR that it (1) intended to enter settlement negotiations with regard to every possible claimant, and (2) was in the midst of settlement negotiations in some of the cases. NCR's objection that it did not get actual notice regarding the individual settlement negotiations is without merit since the statute does not require it. As written, the statute contemplates one case and obviously one set of settlement negotiations, not the circumstances involving multidistrict litigation. At the least, (1) Northwest's notice of the anticipated global settlement would, of necessity, include all pending passenger cases, and (2) Northwest has created a genuine issue of material fact regarding the reasonableness of its efforts.[27]

On the reasonableness issue of subsection (3)(c) of the statute, the court cannot accept NCR's position. Although the opportunity that Northwest offered NCR was, at times, limited and curtailed, on the whole Northwest told NCR that it could participate in the settlement negotiations. *See, e.g.,* Dubuc Letter # 3 ("You are invited to participate in the proposed global settlement on behalf of your client."). NCR complains that Northwest never specified the individual cases or the individual settlement sums. However, this argument ignores the "global" nature of many of the settlements. NCR's complete unresponsiveness, and its utter failure to make an inquiry regarding any questions that it may have had regarding individual settlements, undercuts its position. The opportunity for NCR to participate in settlement negotiations involving all of the claims was available. NCR's responses indicate that it did not want to participate or discuss the matter with Northwest. It cannot rely now upon Northwest's lack of case specificity when it effectively did nothing in response to these letters. At the least, a genuine issue of a material fact exists on this issue.

Accordingly, the court will deny NCR's motion for summary judgment on this alternative ground.

### E.

NCR's final motion for summary judgment applies to Northwest's claims for common law equitable indemnity under Michigan law.[28] This indemnification theory rests upon the equitable principle of a right to restitution. *Dale v. Whiteman,* 388 Mich. 698, 202 N.W.2d 797 (1972). This right of restitution, in turn, stems from the "passive" negligence of the party who seeks indemnity and the "active" negligence of the party from whom indemnity is sought. *Swindlehurst v. Resistance Welder Corp.,* 110 Mich.App. 693, 313 N.W.2d 191 (1981).[29] "Active" and "passive" negligence are distinct:

> If a party breaches a direct duty owed to another and this breach is the proximate

**27.** One question that has not been addressed, and possibly should be, is whether the answer to this question is for this court to decide as a matter of law or is potentially one for a jury to determine. *See, e.g., Kermizian v. Sumcad,* 188 Mich.App. 690, 470 N.W.2d 500 (1991) (addressing issue, which had been subject of divergent panel opinions, whether factual disputes regarding when discovery occurred or should have occurred in malpractice action should be decided by judge as preliminary question or by the jury).

**28.** Michigan also recognizes express and implied contractual theories of indemnification. *Hartman v. Century Truss Co.,* 132 Mich.App. 661, 347 N.W.2d 777 (1984).

**29.** Michigan also declares that common law indemnity is available to an innocent party upon whom liability has been imposed from the person actually responsible for the wrong. *Provencal v. Parker,* 66 Mich.App. 431, 239 N.W.2d 623 (1976). In *Diekevers v. Brekel, Inc.,* 73 Mich. App. 78, 250 N.W.2d 548 (1976), the court said that common law indemnity arises from a special relationship between the primary defendant and the third party defendant. In *Gruett v. Total Petroleum, Inc.,* 182 Mich.App. 301, 451 N.W.2d 608 (1990), the court commented that indemnity may be enforced only in those situations in which liability arises by operation of law from the wrongful acts of the party from whom indemnity is sought.

cause of the other party's injury, that is active negligence. Where the active negligence is attributable solely to another and the liability arises solely by operation of law, that is passive negligence. *Langley v. Harris Corp.*, 413 Mich. 592, 597–98, 321 N.W.2d 662 (1982). Thus, a party who is an "active" wrongdoer cannot recover equitable indemnity. *Williams v. Litton Systems*, 433 Mich. 755, 758, 449 N.W.2d 669 (1989); *State Farm Fire and Casualty Co. v. Super City, Inc.*, 125 Mich.App. 65, 335 N.W.2d 714 (1983); *Bullock v. Black & Decker, Inc.*, 502 F.Supp. 580, 581, 583 (E.D.Mich.1980). Northwest has recognized and espoused this proposition of law. *See* Northwest Airlines Opposition to McDonnell Douglas Motion for Summary Judgment and Cross Motion for Summary Judgment [Liability issues] (under seal) (November 21, 1991), at 6–7.

 Since (1) the Plaintiffs' complaints against Northwest alleged "active" negligence, as well as willful and wanton misconduct, and (2) a jury has found Northwest guilty of negligence and willful and wanton misconduct, Northwest is such an active wrongdoer. "Where a party seeking indemnity is [itself] a wrongdoer, [it] should not recover." *Bullock*, 502 F.Supp. at 581 [check]; *see Proctor & Schwartz, Inc. v. United States Equipment Co.*, 624 F.2d 771, 774 (6th Cir.1980).

Accordingly, the court will grant NCR's motion for summary judgment on all of Northwest's indemnity claims. NCR shall submit an appropriate form of judgment.

### F.

 Northwest moves to amend its third-party complaints and cross-claims in all cases, as well as its hull suit complaint, to add a count against NCR for an intentional and negligent nuisance in fact under Michigan law. Although Fed.R.Civ.P. 15(a) provides that leave to amend "shall be freely given when justice so requires," a court may deny a motion to amend if the amended pleading would be unable to withstand a motion to dismiss or for summary judgment. *Head v. Jellico Housing Authority*, 870 F.2d 1117, 1123 (6th Cir.1989).

Since the court has granted NCR summary judgments on Northwest's third-party claims of contribution and indemnity in earlier portions of this order for reasons that are unrelated to the particular theory that Northwest had advanced, the addition of a nuisance theory cannot resurrect these claims for contribution and indemnity. The nuisance claims would be subject to a summary judgment under the terms of this order. Thus, Northwest's motion to amend the third-party complaint and cross-claim is denied.

However, since the court did not grant NCR's motion for summary judgment in the hull case (Case No. 89–2696), the court will permit Northwest's application for an amendment. Accordingly, the complaint in this case is amended to include a Count XII:

> For a fourth claim against National Car Rental System, Inc.,
>
> 170. Northwest hereby repeats and realleges each and every allegation contained in the immediately preceding paragraph of this Complaint, with the same force and effect as if herein repeated and set forth at length.
>
> 171. National, by virtue of its lease with the Board of County Road Commissioners of the Charter County of Wayne, had had possession and control of property, which it used as a parking lot in its business of renting cars for profit to customers of Northwest Airlines and others arriving and departing from the Airport.
>
> 172. National knew or must have known that Northwest and the general public used the airspace above said property on an ongoing daily basis for arriving and departing flights carrying passengers and property.
>
> 173. National knew or must have known that structures erected on the property into the airspace, including light poles, constituted a condition which has a natural tendency to create danger and inflict injury to persons, property, and aircraft arriving and departing the Airport.

174. National knew, should have known or must have known that structures erected on the property into the airspace, including lightpoles, were substantially certain to result in injury, or presented an unreasonable risk of injury, to persons, property, and aircraft arriving and departing the Airport.

175. National caused a lightpole to be erected into the airspace, was in control of the lightpole, and had possession and control of the property on which the lightpole was located.

176. By erecting the lightpole into the airspace, National committed acts which caused the condition to exist, and by failing to remove the lightpole from the airspace, National made omissions which caused that condition to continue to exist.

177. The lightpole interfered with the use of the airspace and constituted a threatening and impending danger to Northwest and the general public, constituting a public nuisance.

178. The lightpole under the existing conditions and circumstances constituted a nuisance in fact.

179. National's acts and omissions in erecting, maintaining, and failing to remove the lightpole erected in the airspace breached its duty of ordinary care to Northwest and the general public, such breach constituting a negligent nuisance in fact.

180. National intended to erect the lightpole into the airspace used by Northwest and the general public, and maintained the lightpole when it knew or must have known that injury was substantially certain to result from the condition it created, constituting an intentional nuisance in fact.

181. The lightpole was a proximate cause of the Accident and the damages suffered by Northwest.

NCR may plead in response to this amendment by filing a singular answer to Count XII without refiling its earlier responsive pleadings within fifteen (15) business days of the date of this order.

## VI.

On July 16, 1991, CAE submitted a legal memorandum in support of the following requests: (1) the application of the choice of law rules of the transferor state (Minnesota) to all substantive state-law claims and issues, (2) the application of federal law from the Sixth Circuit to all federal claims and issues, (3) an order that federal common law determines the collateral estoppel effect of the prior diversity judgment with respect to the Northwest and MDC claims that were adjudicated, (4) an order that Northwest is collaterally estopped under federal common law from relitigating the issues whether the negligent acts, omissions, and willful and wanton misconduct of Northwest were proximate causes of the accident, and (5) the postponement of any decision regarding choice of law as to Northwest's tort, commercial transaction, and contribution claims pending further discovery, research, and motion practice. Northwest opposes all but the last request.

The first request of CAE is a well-established proposition of law that this court has consistently followed in this multidistrict litigation. *In re Air Crash Disaster at Detroit Metropolitan Airport, Detroit, Michigan on August 16, 1987,* 750 F.Supp. at 797. The more difficult issue, which will be addressed later, is the application of Minnesota choice of law rules.

Under the law of the case doctrine,[30] the court will grant the second and third requests of CAE. In earlier sections of this order, the court determined that it will apply (1) Sixth Circuit law to federal issues, notwithstanding the fora in which the cases were originally filed before their transfer to this court, and (2) federal common law to the collateral estoppel effect of a diversity judgment in a subsequent diversity case.

Similarly, the court will preclude Northwest in its suit against CAE from relitigating that it (1) was negligent, (2) guilty of

---

**30.** "Issues decided at an earlier stage of the litigation, either explicitly or by necessary inference from the disposition of the issues, constitute the law of the case. This rule ordinarily precludes a court from re-examining an issue previously decided by itself or a higher court." *Johns–Manville Corp. v. Guardian Industries Corp.,* 116 F.R.D. 97, 101 (E.D.Mich.1987).

willful and wanton misconduct under Michigan and federal law, and (3) proximately caused the crash of Northwest Flight 255.[31]

The court has no objection to postponing the choice of law issues until the parties have had some opportunity for discovery.

## VII.

On November 8, 1991, MDC filed an under seal motion for summary judgment in the special defense cases in which it claims a right to contribution, indemnity, and subrogation for those monies that it has paid in settlements.[32] On November 22, 1991, Northwest filed its opposition and a cross-motion for summary judgment.

The backdrop for these motions begins by noting that the Plaintiffs sued Northwest and MDC for joint and several liability. However, MDC took the position that Northwest was the only party who was responsible for the crash. *See* MDC Attachment A (Declaration of Peter J. Magee, November 8, 1989, ¶ 4) (as early as November 18, 1987, Northwest's insurer aware of MDC's contention that accident resulted entirely from the willful misconduct of Northwest). In its cross-claim against Northwest, MDC sought recover all of the monies that might be paid in settlements to the estates of deceased passengers. *See, e.g.,* MDC's Cross–Claim Against Northwest (Warsaw Plaintiffs), February 28, 1989, ¶ 25; MDC's Cross–Claim in *Johnson,* 88–4893, January 27, 1989, ¶¶ 17, 25, 28, 35.

Northwest relied upon its special defenses in these cases throughout the litigation. In October of 1989, MDC gave Northwest notice of, and an opportunity to participate in, the settlement discussions with the Plaintiffs. Northwest declined. Thereafter, MDC agreed with the Plaintiffs not to contest the issue of its liability for compensatory damages. This arrangement allowed the Plaintiffs to settle with MDC for a fixed sum or, alternatively, to proceed to trial on the issue of damages only. A portion of the parties' agreement provided that the Plaintiffs would, "to the extent still pending, ... dismiss all claims against all defendants other than MDC ... with prejudice and without costs, all pursuant to an order of the Court, which shall preserve MDC's right to seek contribution or indemnity from Northwest or any other potentially liable entity." MDC Attachment B.

During the trial, MDC ostensibly demonstrated (1) its limited right to recover up to the amount of workers' compensation benefits that have been paid or will be payable from Northwest in three of the cases (*Elfering, Kahle,* and *Rademacher*) and (2) its right to negate the Warsaw and employee pass defenses by proof of Northwest's willful and wanton misconduct.[33]

Prior to the May 8, 1991 jury verdict, MDC had settled several special defense cases and, upon the entry of the jury verdict in the principal case, tendered the defense of the remaining cases to Northwest. Northwest rejected the tender. MDC Attachment 3 (Letter of Douglas E. Winter, May 10, 1991 to Michael H. Selter; Letter of Michael H. Selter, May 21, 1991 to Douglas E. Winter). MDC subsequently settled the remaining cases. On May 31, 1991, the court entered its final judgment, noting in paragraph 6 that "MDC shall recover from Northwest such sums as are, or will be,

---

**31.** The exact scope and effect of this ruling will be addressed later. At this time, Northwest has pending contribution claims against CAE and, if they proceed to trial, evidence pertaining to CAE's and Northwest's conduct in connection with the Flight 255 tragedy may be needed by the jury to determine issues such as proximate cause and comparative fault.

**32.** Except for *Shaffer v. Northwest Airlines,* 88–4651. MDC acknowledges that a prior order of this court determined that it may not obtain recovery in *Shaffer.* MDC Reply Brief, December 2, 1991, at 1 n. 1.

**33.** Within 30 days from the date of this order, Northwest and MDC should inform the court of what position they take with regard to any remaining issues in *Roundy,* No. 89–1276. *See* Order, MDL No. 742 (E.D.Mich. March 19, 1991) (addressing directed verdict motions and leaving issue open as to whether or not Captain Roundy is subject to the limitations of exculpatory language which is contained within the travel pass). The court assumes that subsequent rulings have made the issue left open moot but would like the parties to state their positions for the record.

due and owing under law." [34] Northwest moved to alter or amend the judgment, contending that MDC was (1) not entitled to contribution, indemnity, or subrogation by virtue of its exoneration of liability by the jury, and (2) was, in effect, a volunteer when it entered into the settlements with the Plaintiffs.

In its Order of October 1, 1991, the court, noting that "[n]either Northwest nor MDC have moved to have the legal effect of the jury verdict on the special defense cases determined," concluded that these issues "should be decided explicitly, not by implication." *Id.* at 51 n. 16 and 52. Thereafter, MDC filed a motion at the suggestion of the court during a status conference on October 29, 1991. Northwest has submitted its papers in opposition to the relief sought by MDC.[35]

The legal questions that have been presented are:

(1) Whether MDC is entitled to contribution, when the verdict exonerated MDC of fault, *see* Northwest Comments and Objections to the draft Final Judgment May 20, 1991, at 2–4; Northwest Alternative Motion to Alter or Amend the Final Judgment, June 13, 1991, at 4–5;

(2) Whether MDC is entitled to indemnity, when the complaints against MDC by the Plaintiffs alleged active negligence and the verdict exonerated MDC of fault, *see* Northwest Comments, at 4–6; Northwest Alternative Motion, at 5–9; and

(3) Whether MDC is entitled to subrogation on the ground that the "debt" it paid was one for which it was "primarily liable," *see* Northwest Alternative Motion, at 9–13.

*See also* MDC Brief in Support of Summary Judgment Motion, at 5; Northwest Opposition Brief, at i (listing same three issues with different wording).

### A.

■■■ As mentioned, "[t]he right to contribution in Michigan is controlled entirely by statute, since there was no right to contribution at common law" *Reurink Bros.*, 161 Mich.App. at 70, 409 N.W.2d 725.[36] This doctrine bespeaks of the principles of equity and natural justice. *Piper Aircraft Corp. v. Dumon*, 421 Mich. 445, 364 N.W.2d 647 (1984). In pristine form, the doctrine is suffused with fairness:

> [O]ne who is compelled to pay or satisfy the whole or to bear more than his aliquot share of the common burden or obligation, upon which several persons are equally liable or which they are bound to discharge, is entitled to contribution against the others to obtain from them payment of their respective shares.

*Caldwell v. Fox*, 394 Mich. 401, 419–20, 231 N.W.2d 46 (1975). However, a party seeking equitable contribution must show (1) a "common liability" owed by the wrongdoers to the injured plaintiff, and (2) payment or satisfaction by the party seeking contribution of the entire obligation or more than his aliquot share of the common obligation. *Id.*

■■■ "Common liability" is when the plaintiff's injuries are not apportionable among the various defendants on any rational basis. Thus, "[w]here two or more parties are responsible for an accident which produces a single indivisible injury,

---

**34.** Before the court entered its final judgment, the parties submitted comments and objections to a draft of a proposed judgment that the court submitted for their review. At that time, Northwest raised the issue that MDC was not entitled to contribution or indemnity notwithstanding the verdict.

**35.** MDC has filed its motion only to resolve the remaining liability issues. If it obtains a favorable ruling, MDC notes that "[t]he amount of MDC's recovery in each 'special defense' case will be the subject of separate judgments," as contemplated by the court. MDC Summary Judgment Motion, at 3 n. 5.

**36.** The parties agree that Michigan substantive law governs the issues of contribution, indemnity, and subrogation. The statement in text was not meant to suggest that there was no common law addressing contribution. *See, e.g., United States Fidelity & Guaranty Company v. Liberty Mutual Insurance Company*, 127 Mich.App. 365, 372, 339 N.W.2d 185 (1983) (court determined that neither former nor current contribution statute applied—"We therefore look to the common law governing contribution.").

each individual wrongdoer may be held liable for the entire amount of the damages and thus each of the defendants shares a common liability with the others that are also responsible for the injury." *Id.* at 420 n. 5, 231 N.W.2d 46.

*Mich.Comp.Laws Ann.* § 600.2925a provides for a substantive right of "Contribution between tort-feasors:"

(1) Except as otherwise provided in this act, when 2 or more persons become jointly or severally liable in tort for the same injury to a person or property or for the same wrongful death, there is a right of contribution among them even though judgment has not been recovered against all or any of them.

(2) The right of contribution exists only in favor of a tort-feasor who has paid more than his pro rata share of the common liability and his total recovery is limited to the amount paid by him in excess of his pro rata share. A tortfeasor against whom contribution is sought shall not be compelled to make contribution beyond his own pro rata share of the entire liability.

(3) A tort-feasor who enters into a settlement with a claimant is not entitled to recover contribution from another tortfeasor if any of the following circumstances exist:

(a) The liability of the contributee for the injury or wrongful death is not extinguished by the settlement.

(b) A reasonable effort was not made to notify the contributee of the pendency of the settlement negotiations.

(c) The contributee was not given a reasonable opportunity to participate in the settlement negotiations.

(d) The settlement was not made in good faith.

. . . .

(7) This section does not impair any right of indemnity under existing law. Where 1 tort-feasor is entitled to indemnity from another, the right of the indemnity obligee is for indemnity and not contribution, and the indemnity obligor is not entitled to contribution from the obligee for any portion of his indemnity obligation.

Implicitly, the statute sets forth the elements of a contribution claim by a settling tortfeasor:

(1) joint liability on the part of the plaintiff and defendant;

(2) the plaintiff must have paid more than its pro rata share of the common liability;

(3) the settlement into which the plaintiff entered must extinguish the liability of the defendant;

(4) a reasonable effort must have been made to notify the defendant of the pendency of the settlement negotiations;

(5) the defendant must be given a reasonable opportunity to participate in settlement negotiations; and

(6) the settlement must be made in good faith.

*Reurink Bros.*, 161 Mich.App. at 72–73, 409 N.W.2d 725.

MDC contends that each of these elements have been satisfied. However, Northwest maintains that the jury verdict which exonerated MDC of any fault for the accident demonstrates that (1) MDC is not a joint tortfeasor and (2) the requisite common liability for contribution is lacking. In response, MDC suggests that Northwest confuses the concepts of liability and fault. In addition, MDC asserts that the requisite common liability has been established because (1) it stipulated to liability, without fault, to the special defense estates, and (2) the jury verdict established Northwest's liability as well as its fault for the accident.

On the basis of the Michigan statutes and case law, this court finds that MDC is not entitled to contribution. MDC is neither a wrongdoer nor a tortfeasor, and it is not required to pay a proportionate share of its nonexistent common liability. The doctrine of contribution implies that there are at least two wrongdoers, one of whom will be required to contribute to the other to apportion the joint or several liability fairly. In order for contribution to be allowed, it is necessary that "the tortfeasors commonly share a burden of tort liability or, as it is sometimes put, there is a

common burden of liability in tort." *O'Dowd,* 419 Mich. at 604–05, 358 N.W.2d 553.

MDC is attempting to shift the entire amount of its settlement payments to Northwest, not trying to apportion them on a percentage basis.[37] However, "[c]ontribution distributes the loss among the tortfeasors by requiring each to pay his proportionate share; indemnity shifts the entire loss from one tortfeasor who has been compelled to pay it to the shoulders of another who should bear it instead." *Langley v. Harris Corp.,* 413 Mich. 592, 597, 321 N.W.2d 662 (1982).

Although recognizing that the equities favor MDC on this issue, the court cannot ignore the requirements of Michigan statutory and case law. MDC does not cite any controlling Michigan authority that would equate a settlement (pursuant to a stipulation not to contest liability) with "a common burden of liability in tort." *See West American Ins. Co. v. Yellow Cab Company,* 495 So.2d 204 (Fla.App.1986), *review denied,* 504 So.2d 769 (Fla.1987). The point is that MDC must look to other legal theories in support of its application. In any event, MDC cannot recover on both theories of indemnity and contribution. *See* Prosser, Torts (4th ed.) § 50, at 308.

### B.

 MDC also claims an entitlement to indemnification under Michigan law. Common law indemnity is available when (1) liability has been imposed on a party by reason of its relationship to a tortfeasor, (2) liability is imposed by operation of law, (3) a party is free from personal fault or causal negligence, or (4) a party is merely guilty of "passive" negligence. *Hardy v. Monsanto Enviro–Chem Systems, Inc.,* 414 Mich. 29, 323 N.W.2d 270 (1982); *see Sawka v. Prokopowycz,* 104 Mich.App. 829, 306 N.W.2d 354 (1981). This doctrine proceeds from "the equitable notion that a party should not pay an obligation resulting from another's wrongful act." *Proctor & Schwartz, Inc. v. United States Equip. Co.,* 624 F.2d 771, 773 (6th Cir.1980).

In *Proctor,* an employee was injured while cleaning a piece of machinery that United States Equipment Company (Equipment) had purchased from Proctor & Schwartz, Inc. (Proctor). The employee sued Proctor for negligence and breach of warranty. Proctor and Norman settled the claim for $75,000, following which Proctor filed suit against Equipment in which it sought common law indemnity.

 The district court dismissed the indemnity claim insofar as it was based on traditional common law principles because this theory "requires that the party seeking indemnity be free from personal fault." *Id.* at 773 (citing *Dale v. Whiteman,* 388 Mich. 698, 202 N.W.2d 797 (1972)). Thus, if a party who seeks indemnity is guilty of "active" causal negligence, as opposed to "passive" negligence, the action must fail.[38] *Id.; see Indemnity Ins. Co. v. Otis Elevator Co.,* 315 Mich. 393, 24 N.W.2d 104 (1946). In the typical situation, the party who is entitled to indemnity is free from personal negligence but is vicariously liable for the negligence of another. *See, e.g., Prosky v. National Acme Company,* 404 F.Supp. 852, 855 (E.D.Mich.1975).

In affirming the district court, the Sixth Circuit noted that, since the employee's suit against Proctor did not proceed to trial, it must look to the theories upon which the employee sought recovery. *See, e.g., Hill v. Sullivan Equipment Co.,* 86 Mich.App. 693, 273 N.W.2d 527 (1978). In count one, the employee alleged that Proctor had negligently designed, manufactured, and sold the machine on which he was injured. Since this count alleged fault that was attributable solely to Proctor, it would preclude indemnity if the employee had recovered on this theory. *See Husted v. Consumers Power Company,* 376 Mich. 41, 135 N.W.2d 370 (1965). The Sixth Circuit con-

---

**37.** However, MDC does argue that its percentage of fault is 0 and Northwest's is 100. This apportionment is not contribution but indemnity or subrogation.

**38.** The Michigan Supreme Court defined "active" and "passive" negligence in *Langley,* 413 Mich. at 597–98, 321 N.W.2d 662.

cluded that "[e]ach aspect of this [complaint] complains of conduct on Proctor's part, which precludes indemnity on traditional principles." 624 F.2d at 774 (citing several Michigan cases).

Similarly, the Plaintiffs in this multidistrict litigation sued MDC on negligence theories. MDC stipulated with the Plaintiffs that it would not contest liability and agreed to compensate them for a sum certain or allow a damages only trial. Even though MDC preserved its right to seek contribution and indemnity for the monies that it had paid or would pay in settlement, MDC is not entitled to claim the traditional common law indemnity from Northwest. In *Williams*, it was noted that

> [i]t is of no importance whether [the defendant/third-party plaintiff] paid the plaintiff pursuant to a judgment entered on a jury's verdict or pursuant to a consent judgment or settlement. It would not have been subjected to any liability but for [the plaintiff's] theory that [the defendant/third-party plaintiff] was actively negligent or at fault, and [the plaintiff] did not allege vicarious or passive fault.

433 Mich. at 760 n. 6, 449 N.W.2d 669.

Northwest also contends that "established Michigan law provides that a party is not entitled to indemnity if it was not, in fact, liable for the judgment in the underlying action." *Proctor*, 624 F.2d at 775 (citing *Knickerbocher v. Wilcox*, 83 Mich.App. 200 (1890); *Tankrederiet Gefion A/S v. Hyman–Michaels Company*, 406 F.2d 1039 (6th Cir.1969)). However, MDC relies upon a "potential liability" exception by which a settling party need not show actual liability in order to obtain indemnification, but may recover if there was potential liability and (1) the settlement was reasonable, and (2) the party from whom indemnity is sought had an opportunity to object to the settlement terms.

This exception has been limited to cases in which an enforceable contract of indemnity exists, a seasonable tender of defense with notice that a settlement will be entered is made and the tender of defense is refused. *See Trim v. Clark Equipment Corp.*, 87 Mich.App. 270, 277, 274 N.W.2d 33 (1978). This situation does not exist in the context of the present motions because there is neither a contract of indemnity nor a seasonable tender of defense. *See* Dubuc Declaration, November 19, 1991.

With some persuasive appeal, MDC argues that the court should not look to the underlying complaints but rather to the jury verdict that exonerated MDC of any fault for the accident. However, Michigan law would not accord the verdict any controlling import because the indemnity claims fail as a matter of law.

For the above reasons, MDC is not entitled to indemnification in the special defense cases.

### C.

■ As its final theory of recovery, MDC relies upon equitable subrogation, which is a "legal fiction through which a person who pays a debt for which another is primarily responsible is substituted or subrogated to all the rights and remedies of the other," unless the payor is a mere volunteer. *Continental Casualty Co. v. Great American Ins. Co.*, 732 F.Supp. 929, 932 (N.D.Ill.1990) (quoting *Commercial Union Ins. Co. v. Medical Protective Co.*, 426 Mich. 109, 117, 393 N.W.2d 479 (1986); *Smith v. Sprague*, 244 Mich. 577, 579–80, 222 N.W. 207 (1928)). "[T]he doctrine is broad enough to include every instance in which one party pays the debt for which another is primarily answerable, and which in equity and good conscience should have been discharged by such other." *Allstate Ins. Co. v. Snarski*, 174 Mich.App. 148, 435 N.W.2d 408 (1988), *appeal denied*, 432 Mich. 883 (1989).

■ This right of subrogation extends to those who pay the proper debt of another in self-protection, which would include a settlement of litigation. *See Michigan Hospital Service v. Sharpe*, 339 Mich. 357, 372–73, 63 N.W.2d 638 (1954); *Machined Parts Corp. v. Schneider*, 289 Mich. 567, 574–75, 286 N.W. 831 (1939). MDC contends that equity demands subrogation in the litigation at hand because it

paid the Plaintiffs for a debt that in the end was shown to be entirely owed by Northwest. MDC paid settlement monies in response to pending civil proceedings in an effort to avoid additional litigation and expense as well as to narrow the controversy.

In response, Northwest maintains that MDC did not pay a debt in the special defense cases for which Northwest was primarily liable because (1) MDC had significant exposure to the Plaintiffs, and (2) its stipulations with the Plaintiffs only created debts for MDC.

This court believes that MDC is entitled to subrogation. The special defense Plaintiffs sued Northwest and MDC for negligence. In part because of its special defenses, Northwest would not settle with these Plaintiffs. To provide compensation for these Plaintiffs and to narrow the controversy to those who would be the principal litigants (Northwest and MDC), MDC (1) settled with the Plaintiffs, (2) obtained a release for Northwest, and (3) preserved its rights to seek payment for any monies that it paid in settlements. The public policy in Michigan encourages settlements. *Hayes v. Coleman*, 338 Mich. 371, 61 N.W.2d 634 (1953); *see Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368 (6th Cir.), *cert. denied*, 429 U.S. 862, 97 S.Ct. 165, 50 L.Ed.2d 140 (1976).

Similarly, Northwest settled certain cases and was asserting its own right to contribution and indemnity from MDC. Thus, the controversy was properly postured between the manufacturer of the aircraft and its operator. Following the lengthy trial of these claims, the jury determined that Northwest—not MDC—was responsible for the accident. Equity cries out, and simple justice demands, that Northwest bear the economic responsibility for its wrongful actions. To hold other-

wise would make a mockery of this entire eighteen month trial. The Michigan Supreme Court would agree: "[S]ubrogation often is appropriately viewed as an important technique for serving the ends of justice by placing the economic responsibility for injuries on the party whose fault caused the loss...." *Atlanta International Ins. Co. v. Bell*, 438 Mich. 512, 522 n. 13, 475 N.W.2d 294 (1991) (quoting Keeton & Widiss, Insurance Law, at 220–21).[39]

Accordingly, other than in the *Shaffer* case, No. 88–4651, MDC may recover from Northwest in subrogation those settlement monies that it has paid in the special defense cases. The issues pertaining to the settlement amounts and judgments in these cases will be addressed in separate proceedings.

## VIII.

This court will conduct a status conference with Northwest, NCR, and CAE to discuss the future proceedings in their cases (discovery, motion practice, settlement, and any other applicable matter).

IT IS SO ORDERED.

## ATTACHMENT A

### VERDICT FORM

We, the jury, answer the questions submitted by the Court as follows:

## I. McDONNELL DOUGLAS' CLAIMS AGAINST NORTHWEST AIRLINES

Question 1: Was the 255 flight crew negligent, as alleged by McDonnell Douglas under its Claim # 1?

Answer: Yes _✓_ No___

[If you answered yes to Question 1, proceed to Question 2. If you answered no to Question 1, proceed to Question 3.]

---

**39.** *Other jurisdictions support this view. See, e.g., Newcomer v. Masini,* 724 P.2d 1122 (1986); *Alamida v. Wilson,* 53 Haw. 398, 495 P.2d 585 (1972) (if contribution or indemnity unavailable, a settling party may recover in subrogation: "Something is radically wrong with a rule which would require one to establish his own wrongdoing in order to avail himself of an equitable remedy."); *Yellow Cab Co.,* 495 So.2d 204 (person injured in auto accident sued his driver's insurer and cab driver; insurer settled with plaintiff and obtained cab driver's release then pursued contribution and indemnity claims against cab driver; at trial, cab driver found 100% at fault; on appeal, court held that contribution and indemnity unavailable but that it would be inequitable to deny recovery; therefore, recovery allowed on subrogation theory).

Question 2: Was the negligence of the 255 flight crew a proximate cause of the accident, as alleged by McDonnell Douglas under its Claim #1?

Answer: Yes ✓ No___

[Proceed to Question 3.]

Question 3: Was Northwest Airlines' management negligent with regard to piloting procedures, as alleged by McDonnell Douglas under its Claim #2?

Answer: Yes ✓ No___

[If you answered yes to Question 3, proceed to Question 4. If you answered no to Question 3, proceed to Question 5.]

Question 4: Was the negligence of Northwest Airlines' management relating to piloting procedures a proximate cause of the accident, as alleged by McDonnell Douglas under its Claim #2?

Answer: Yes ✓ No___

[Proceed to Question 5.]

Question 5: Was Northwest Airlines' management negligent with regard to its training and supervision of the 255 flight crew, as alleged by McDonnell Douglas under its Claim #3?

Answer: Yes ✓ No___

[If you answered yes to Question 5, proceed to Question 6. If you answered no to Question 5, proceed to Question 7].

Question 6: Was the negligence of Northwest Airlines' management in its training and supervision of the 255 flight crew a proximate cause of the accident, as alleged by McDonnell Douglas under its Claim #3?

Answer: Yes ✓ No___

[Proceed to Question 7.]

Question 7: Was Northwest Airlines' management and/or its flight crew negligent by failing to comply with governmental regulations (FARs), as alleged by McDonnell Douglas under its Claim #4?

Answer: Yes ✓ No___

[If you answered yes to Question 7, proceed to Question 8. If you answered no to Question 7, proceed to Question 9.]

Question 8: Was the negligent failure to comply with governmental regulations (FARs) a proximate cause of the accident, as alleged by McDonnell Douglas under its Claim #4?

Answer: Yes___ No___

[Proceed to Question 9. However, if you answered no to Questions 1 or 2, skip Questions 9 and 10.]

Question 9: Did Northwest Airlines negligently entrust the 255 flight crew with the aircraft, as alleged by McDonnell Douglas under its Claim #5?

Answer: Yes___ No ✓

[If you answered yes to Question 9, proceed to Question 10. If you answered no to Question 9, proceed to Question 11.]

Question 10: Was the negligent entrustment a proximate cause of the accident, as alleged by McDonnell Douglas under its Claim #5?

Answer: Yes___ No___

[Proceed to Question 11.]

Question 11: Did Northwest Airlines' management and/or its flight crew engage in willful or wanton misconduct under Michigan law, as alleged by McDonnell Douglas under its Claim #6?

Answer: Yes ✓ No___

[If you answered yes to Question 11, proceed to Question 12. If you answered no to Question 11, proceed to Question 13.]

Question 12: Was the willful or wanton misconduct under Michigan law a proximate cause of the accident, as alleged by McDonnell Douglas under its Claim #6?

Answer: Yes ✓ No___

[Proceed to Question 13.]

Question 13: Did Northwest Airlines' management and/or its flight crew engage in willful misconduct under federal law, as alleged by McDonnell Douglas under its Claim #7?

Answer: Yes ✓ No___

[If you answered yes to Question 13, proceed to Question 14. If you answered no to Question 13, proceed to Question 15.]

Question 14: Was the willful misconduct under federal law a proximate cause of the

accident, as alleged by McDonnell Douglas under its Claim # 7?

Answer: Yes__✓__ No___

[Proceed to Question 15.]

## II. NORTHWEST AIRLINES' CLAIMS AGAINST McDONNELL DOUGLAS

Question 15: Was the aircraft defectively manufactured, as alleged by Northwest Airlines under its Claim # 1?

Answer: Yes___ No__✓__

[If you answered yes to Question 15, proceed to Question 16. If you answered no to Question 15, proceed to Question 17.]

Question 16: Was the defect in manufacture a proximate cause of the accident, as alleged by Northwest Airlines under its Claim # 1?

Answer: Yes___ No___

[Proceed to Question 17.]

Question 17: Was the aircraft defectively designed, as alleged by Northwest Airlines under its Claim # 2?

Answer: Yes___ No__✓__

[If you answered yes to Question 17, proceed to Question 18. If you answered no to Question 17, proceed to Question 19.]

Question 18: Was the defective design a proximate cause of the accident, as alleged by Northwest Airlines under its Claim # 2?

Answer: Yes___ No___

[Proceed to Question 19.]

Question 19: Was the aircraft defective because of a failure to warn, as alleged by Northwest Airlines under its Claim # 3?

Answer: Yes___ No__✓__

[If you answered yes to Question 19, proceed to Question 20. If you answered no to Question 19, proceed to Question 21.]

Question 20: Was this defect a proximate cause of the accident, as alleged by Northwest Airlines under its Claim # 3?

Answer: Yes___ No___

[Proceed to Question 21.]

Question 21: Was the aircraft negligently manufactured, as alleged by Northwest Airlines under its Claim # 4?

Answer: Yes___ No__✓__

[If you answered yes to Question 21, proceed to Question 22. If you answered no to Question 21, proceed to Question 23.]

Question 22: Was the manufacturing negligence a proximate cause of the accident, as alleged by Northwest Airlines under its Claim # 4?

Answer: Yes___ No___

[Proceed to Question 23.]

Question 23: Was the aircraft negligently designed, as alleged by Northwest Airlines under its Claim # 5?

Answer: Yes___ No__✓__

[If you answered yes to Question 23, proceed to Question 24. If you answered no to Question 23, proceed to Question 25.]

Question 24: Was the negligent design a proximate cause of the accident, as alleged by Northwest Airlines under its Claim # 5?

Answer: Yes___ No___

[Proceed to Question 25.]

Question 25: Did McDonnell Douglas negligently fail to warn about dangers associated with the aircraft, as alleged by Northwest Airlines under its Claim # 6?

Answer: Yes___ No__✓__

[If you answered yes to Question 25, proceed to Question 26. If you answered no to Question 25, proceed to Question 27.]

Question 26: Was the negligent failure to warn a proximate cause of the accident, as alleged by Northwest Airlines under its Claim # 6?

Answer: Yes___ No___

[Proceed to Question 27.]

Question 27: Was McDonnell Douglas negligent for failing to comply with governmental regulations (FARs), as alleged by Northwest Airlines under its Claim # 7?

Answer: Yes___ No__✓__

[If you answered yes to Question 27, proceed to Question 28. If you answered no to Question 27, proceed to Question 29.]

Question 28: Was the negligent failure to comply with governmental regulations (FARs) a proximate cause of the accident, as alleged by Northwest Airlines under its Claim # 7?

Answer: Yes___ No___
[Proceed to Question 29.]

**Question 29:** Did McDonnell Douglas make an intentional misrepresentation in its AOLs concerning the quality of the Texas Instruments' 7274–55 circuit breakers, as alleged by Northwest Airlines under its Claim # 8?

Answer: Yes___ No_✓_

[If you answered yes to Question 29, proceed to Question 30. If you answered no to Question 29, proceed to Question 31.]

**Question 30:** Was this intentional misrepresentation a proximate cause of the accident, as alleged by Northwest Airlines under its Claim # 8?

Answer: Yes___ No___
[Proceed to Question 31.]

**Question 31:** Did McDonnell Douglas make a negligent misrepresentation in its AOLs concerning the quality of the Texas Instruments' 7274–55 circuit breakers, as alleged by Northwest under its Claim # 9?

Answer: Yes___ No_✓_

[If you answered yes to Question 31, proceed to Question 32. If you answered no to Question 31, proceed to Question 33.]

**Question 32:** Was this negligent misrepresentation a proximate cause of the accident, as alleged by Northwest Airlines under its Claim # 9?

Answer: Yes___ No___
[Proceed to Question 33.]

**Question 33:** Did McDonnell Douglas make an intentional misrepresentation to the Federal Aviation Administration by its statements about the operation of the Central Aural Warning System (CAWS) Fail Light, as alleged by Northwest Airlines under its Claim # 10?

Answer: Yes___ No_✓_

[If you answered yes to Question 33, proceed to Question 34. If you answered no to Question 33, proceed to Question 35.]

**Question 34:** Was this intentional misrepresentation a proximate cause of the accident, as alleged by Northwest Airlines under its Claim # 10?

Answer: Yes___ No___
[Proceed to Question 35.]

### III. APPORTIONMENT OF FAULT

**Question 35:** If, in answering these questions, you found that (1) Northwest Airlines engaged in wrongful conduct and that such conduct was a proximate cause of the accident *AND* (2) McDonnell Douglas engaged in wrongful conduct and that such conduct was a proximate cause of the accident, you must apportion the fault between Northwest Airlines and McDonnell Douglas. Using 100 percent as the total combined fault, what percentage of fault was attributable to the conduct of Northwest Airlines, and what percentage was attributable to the conduct of McDonnell Douglas?

If you did not find Northwest Airlines *AND* McDonnell Douglas responsible for (1) wrongful conduct and (2) proximate cause of the accident, write Not Applicable (N/A) in each of the spaces provided below.

Answer: Northwest Airlines _100_ %

McDonnell Douglas _0_ %

TOTAL _100_ %

In signing my name to this verdict form, I, in my capacity as foreperson, represent that the answers to the questions on pages 1–9 reflect the unanimous decisions of the jury in the above-entitled litigation.

Date: May 8, 1991. [Signature]
 Foreperson

### ATTACHMENT B

### FINAL JUDGMENT ON CLAIMS BETWEEN NORTHWEST AIRLINES AND MCDONNELL DOUGLAS

#### May 31, 1991

The issues in controversy between Northwest Airlines, Inc. (Northwest) and McDonnell Douglas Corporation (MDC) in this cause were presented to a jury, Chief Judge Julian Abele Cook, Jr., presiding, during a trial which began on October 31, 1989, and ended on April 4, 1991. Approximately six weeks later, the jury, having reviewed the evidence, rendered its verdict on May 8, 1991 in open court.

On the basis of this verdict, as well as prior Orders, the Court enters the following judicial determinations in this cause:

1. A judgment is entered in favor of MDC and against Northwest regarding MDC's claims 1, 2, 3, 4, 6, and 7 against Northwest, as identified in the jury instructions and in the verdict form.

2. A judgment is entered in favor of Northwest and against MDC relating to MDC's claim 5 against Northwest, as expressed in the jury instructions and in the verdict form.

3. A judgment is entered in favor of MDC and against Northwest pertaining to Northwest's claims 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10 against MDC, as set forth in the jury instructions and in the verdict form.

4. A judgment is entered in favor of Northwest and against MDC with respect to all claims brought by MDC against Northwest during this cause that were not submitted to the jury because they were dismissed by prior Orders of this Court.

5. A judgment is entered in favor of MDC and against Northwest with respect to all claims brought by Northwest against MDC during this cause that were not submitted to the jury because they were dismissed by prior Orders of this Court.

6. MDC shall recover from Northwest such sums as are, or will be, due and owing under law, and

7. Northwest shall take nothing and its claims against MDC are dismissed on the merits.

Under Federal Rule of Civil Procedure 54(b), this Court makes the express determination that there is no just reason for the delay of a final judgment in these claims. The Clerk is directed to enter a final judgment as to these claims pursuant to Federal Rule of Civil Procedure 79(a).

IT IS SO ORDERED.

May 31, 1991.

Detroit, Michigan.

ATTACHMENT C

AMENDED FINAL JUDGMENT ON CLAIMS BETWEEN NORTHWEST AIRLINES AND MCDONNELL DOUGLAS

October 1, 1991

The issues in controversy between Northwest Airlines, Inc. (Northwest) and McDonnell Douglas Corporation (MDC) in this cause were presented to a jury, Chief Judge Julian Abele Cook, Jr., presiding, during a trial which began on October 31, 1989 and ended on April 4, 1991. Approximately six weeks later, the jury, having reviewed the evidence, rendered its verdict on May 8, 1991 in open court.

On the basis of this verdict, as well as prior Orders, the Court enters the following judicial determinations in this cause:

1. A judgment is entered in favor of MDC and against Northwest regarding MDC's claims 1, 2, 3, 4, 6, and 7 against Northwest, as identified in the jury instructions and in the verdict form.

2. A judgment is entered in favor of Northwest and against MDC relating to MDC's claim 5 against Northwest, as expressed in the jury instructions and in the verdict form.

3. A judgment is entered in favor of MDC and against Northwest pertaining to Northwest's claims 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10 against MDC, as set forth in the jury instructions and in the verdict form.

4. A judgment is entered in favor of Northwest and against MDC with respect to all claims brought by MDC against Northwest during this cause that were not submitted to the jury because they were dismissed by prior Orders of this Court.

5. A judgment is entered in favor of MDC and against Northwest with respect to all claims brought by Northwest against MDC during this cause that were not submitted to the jury because they were dismissed by prior Orders of this Court.

6. MDC shall recover from Northwest such sums as are, or will be, due and owing under law. The determination of what sums, if any, are due and owing with re-

gard to the Special Defense cases will be deferred pending further proceedings, Order, October 1, 1991, and

7. Northwest shall take nothing and its claims against MDC are dismissed on the merits.

Under Federal Rule of Civil Procedure 54(b), this Court makes the express determination that there is no just reason for the delay of a final judgment in these claims. The Clerk is directed to enter a final judgment as to these claims pursuant to Federal Rule of Civil Procedure 79(a).

IT IS SO ORDERED.

October 1, 1991.

Detroit, Michigan.